KANSAS CITY, C. C. & ST. J. RY. CO. v. BARKER, Atty. Gen., et al.

(District Court, W. D. Missouri, W. D. May 27, 1915.)

No. 64.

CARRIERS ☞12(5)—RATES—AUTHORITY TO PRESCRIBE UNREMUNERATIVE RATES.
    Assuming that Public Service Commission Law (Laws Mo. 1913, p. 576) § 35, subsec. 4, providing that nothing therein, or in any other law, shall limit the power of the Commission to require the sale of, and prescribe reasonable and just maximum fares for, commutation tickets, authorizes the Commission to order the sale of suburban commutation tickets, and to prescribe rates therefor, where a carrier's earnings fall short of a fair return to any extent, the Commission cannot prescribe commutation rates which will still further reduce such earnings, even though to a comparatively negligible extent, and such action is not authorized by reason of local public demand or interest, or by the Commission's views of the probable beneficial effects of such rates upon the company's business.
    [Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 11, 15–20.]

In Equity. Suit by the Kansas City, Clay County & St. Joseph Railway Company against John T. Barker, Attorney General, and others. On motion for temporary injunction. Motion granted.

Justin D. Bowersock, of Kansas City, Mo., and John M. Olin, of Madison, Wis. (Bowersock, Hall & Hook, of Kansas City, Mo., and Olin, Butler, Stebbins, Curkeet & Stroud, of Madison, Wis., of counsel), for complainant.

William G. Busby, of Carrollton, Mo., General Counsel to Public Service Commission.

M. E. Lawson, Ralph Hughes, and W. E. Campbell, all of Liberty, Mo., and Wright & Alford and Frank A. Boys, all of Kansas City, Mo., for defendants.

Before CARLAND, Circuit Judge, and DYER and VAN VALKENBURGH, District Judges.

PER CURIAM. This cause is before us on motion for a temporary injunction. The motion is made upon the bill and supporting affidavits. Opposing affidavits have also been filed by defendants. The prayer

of the bill asks that two certain orders of the Public Service Commis-sion, hereinafter called the Commission, made December 5, 1914, be declared void, and that their enforcement be permanently restrained. The orders referred to relate to the following subjects:

One order fixed the fair present value of all the property of com-plainant, for the purpose of determining reasonable and just rates, at the sum of $3,900,000. The other order is in words and figures as follows:

"Ordered: (1) That the Commission does hereby find as a fact that de-fendant, Kansas City, Clay County & St. Joseph Railway Company, should be required to put on sale to the public, on and after January 1, 1915, rea-sonable and just fares as the maximum to be charged for commutation tickets on its road between the stations hereinafter named.

"Ordered: (2) That the reasonable and just fares, as the maximum to be charged by said defendant for commutation tickets, are hereby prescribed as follows:

| Between Kansas City, Third and Cherry, and | Distance. | 52 Single Trip Individual Ticket, Limited 30 days from Date of Sale. |
|---|---|---|
| Avondale | 4.41 | $3.00 |
| Moscow | 5.42 | 3.50 |
| Winn Wood Lake | 6.23 | 4.00 |
| Winnetonka | 7.01 | 4.50 |
| Maple Park | 7.67 | 5.00 |
| Claycomo | 9.02 | 6.00 |
| Ravena | 9.85 | 6.50 |
| Hymer | 10.76 | 7.00 |
| Urban Heights | 11.65 | 7.50 |
| Withers | 12.73 | 7.75 |
| Liberty, Mo. | 14.18 | 8.50 |
| Darby | 3.45 | 2.25 |
| Schroeder | 4.56 | 3.00 |
| Brenner | 5.00 | 3.25 |
| North Moore | 6.27 | 4.00 |
| Deister | 7.19 | 4.75 |
| Northern Heights | 8.24 | 5.25 |

"Ordered: (3) That the fares hereinbefore fixed shall be the maximum fares to be charged by said defendant for said commutation tickets from and after January 1, 1915, and thereafter until changed or abrogated by the Commission as provided by statute, and that said defendant shall, at its ticket stations on its line of road, sell commutation tickets at a price not to exceed the maximum rates of fare herein prescribed.

"Ordered: (4) That said defendant keep true and correct records of its total gross sale of commutation tickets, from month to month, and file a monthly statement with the Commission, duly verified by its general manager, setting forth fully all income received from the sale of said commutation tickets.

"Ordered: (5) That complainants and defendant be at liberty, at any time after an actual test of the commutation rates fixed herein has been made, to apply to the Commission by motion or supplemental petition, upon such proof as either may desire, and upon reasonable notice to said complainants or defendant, for a modification or revision of the fares for commutation tickets prescribed herein, if found to be unreasonable or unjust to the public or said defendant, or shall fail to provide a fair and just return on the fair present value of defendant's property as fixed in case No. 179 by this Commis-sion.

"Ordered: (6) That this order shall take effect on December 30, 1914, and that the secretary of the Commission forthwith serve on complainants and de-fendant certified copies of this order and the opinion filed herein."

A temporary restraining order was granted herein by the District Judge on the filing of the bill, and a hearing before three judges was arranged, pursuant to the provisions of section 266 of the Judicial Code (Act March 3, 1911, c. 231, 36 Stat. 1162 [Comp. St. 1916, § 1243]). The complainant charges that the order fixing the value deprives complainant of its property without due process of law, not only in that the rates order is based thereon, but for other reasons as well: Because, as is claimed, the Commission erroneously excluded from that valuation large sums alleged to have been expended for interest and commissions during the period of construction and as discounts on the sale of bonds and of preferred stock, and refused to make any allowance for going value or for services performed and expenses incurred in promotion. These contentions, respecting the valuation order, involve matters which must ultimately require careful and serious consideration; but, for reasons which seem to us to be sufficient, their present determination is unnecessary. For the purposes of this hearing, the order fixing the value of complainant's property may be considered as acting only through that establishing and ordering in the commutation rates. It is, therefore, the rates order to which our attention at present must be directed.

The authority of the Commission to require complainant to put in commutation rates is based upon subsection 4 of section 35 of the Public Service Commission Law, which reads as follows:

"Nothing in this section nor in any other provision of law shall be deemed to limit the power of the Commission to require the sale of, and upon investigation prescribe reasonable and just fares as the maximum to be charged for commutation, school or family commutation, mileage tickets over railroads or street railroads, joint interchangeable mileage tickets, round trip excursion tickets, or any other form of reduced rate passenger tickets over such railroads or street railroads: Provided, that all special round trip excursion tickets, the sale of which is limited to less than thirty days, except round trip excursion tickets to state and county fairs and return during the holding thereof, shall be deemed exempt from such regulation by the Commission."

Having determined the value of complainant's property to be $3,900,000, and the net income for the first full year of operation of defendant's line from all sources to be $242,488.22, or a return of 6.2 per cent. on such determined value of its property, the Commission states its conclusions as follows:

"Our conclusion as to the net earnings of the defendant is that while the return is not so high as we would allow if the earnings warranted it, it is a remarkably good showing under the conditions existing during the first year of operation, and does not fall short of a fair return to such an extent as to be a valid reason for refusing to establish reasonable commutation rates, if such rates are otherwise justified. The question remains: Should this Commission, under the facts and circumstances in evidence, prescribe a maximum commutation rate and require the defendant to sell commutation tickets? Answering this question directly, we think the complainants have shown that they are entitled to such relief. Other carriers have voluntarily put such rates into effect with profit. It is shown that many other interurban lines at cities of near the same population as Kansas City and that three other lines at Kansas City now have such reduced rates. There is no doubt that for a distance of several miles from Kansas City there are desirable sites for suburban residence property at stations on defendant's line, and especially at the town of Liberty. In our opinion, a reasonable commutation rate for such

distance will increase the defendant's passenger traffic, and in any event will not result in any material diminution of net earnings."

It is estimated that the commutation rates fixed by the Commission, if fully used by the patrons, would yield a return to the complainant of 1.16 cents per passenger mile. The maximum rate permitted to carriers in the state of Missouri is 2 cents per passenger mile. Speaking to the contention of complainant that this commutation rate would compel the carriage of such passengers at a loss, the Commission finds as follows:

"As the number of such passengers (that is, passengers from Kansas City to the stations mentioned in the rate order) now carried do not exceed 40 or 50, some of them being carried for a short distance, the loss to defendant upon that assumption, considering the magnitude of the total of its business, would be almost negligible."

It was urged at the hearing that these rates were desired by persons, to the number stated, who reside in Liberty and make daily trips to Kansas City. Witnesses gave it as their opinion that, if reasonable commutation rates were put into effect by defendant, a large use would be made thereof by persons who reside in Liberty and make daily trips to Kansas City, and as well in the opposite direction by students attending Liberty colleges whose homes were in Kansas City. From the opinion filed it appears that the Commission attached considerable importance to this suggestion.

Conceding, without deciding, that the section of the Missouri Public Service Commission Law hereinabove quoted confers upon the Commission power to require the sale of, and, upon investigation, prescribe reasonable and just fares as the maximum to be charged for, commutation tickets, it will not, we suppose, be seriously contended that the law, and the authority conferred thereunder, does not presuppose that such rates should be remunerative, or at least that the return from the entire class of traffic affected should be adequate. The Commission, in its opinion, comes dangerously near to holding the contrary. It finds that the present net maximum is 6.2 per cent.—obviously an unusually low percentage of return upon an investment of this character. This is admitted when it is said that that return "is not so high as we would allow if the earnings warranted it," and further that it "does not fall short of a fair return to such an extent as to be a valid reason for refusing to establish reasonable commutation rates if such rates are otherwise justified." But, if the rate is not so high as should be allowed if the earnings warranted it, and if it falls short of a fair return to any extent, then it is not such a reasonable and remunerative return as the law guarantees; and any order which still further reduces it to an appreciable, even if comparatively "negligible," extent would appear to be confiscatory. Though the amount be insignificant, the principle involved is none the less weighty.

Since this case was submitted, two opinions have been handed down by the Supreme Court of the United States which have an important bearing upon the question here presented. They are Northern Pacific Railway Co. and Minneapolis, St. Paul & Sault Ste. Marie Railway Co. v. State of North Dakota ex rel. T. F. McCue, Attorney General, 35

Sup. Ct. 429, 236 U. S. 585, 59 L. Ed. 735, Ann. Cas. 1916A, 1, and Norfolk & Western Railway Co. v. W. G. Conley, Attorney General of the State of West Virginia, et al., 35 Sup. Ct. 437, 236 U. S. 605, 59 L. Ed. 745. The first of these cases contains many observations pertinent to the case at bar. It is there said:

"But, broad as is the power of regulation, the state does not enjoy the freedom of an owner. The fact that the property is devoted to a public use on certain terms does not justify the requirement that it shall be devoted to other public purposes, or to the same use on other terms, or the imposition of restrictions that are not reasonably concerned with the proper conduct of the business according to the undertaking which the carrier has expressly or impliedly assumed. If it has held itself out as a carrier of passengers only, it cannot be compelled to carry freight. As a carrier for hire, it cannot be required to carry persons or goods gratuitously. The case would not be altered by the assertion that the public interest demanded such carriage. The public interest cannot be invoked as a justification for demands which pass the limits of reasonable protection and seek to impose upon the carrier and its property burdens that are not incident to its engagement. In such a case it would be no answer to say that the carrier obtains from its entire intrastate business a return as to the sufficiency of which in the aggregate it is not entitled to complain. Thus, in Lake Shore & Michigan Southern Ry. Co. v. Smith, 173 U. S. 684 [19 Sup. Ct. 565, 43 L. Ed. 858], the regulation as to the sale of mileage books was condemned as arbitrary, without regard to the total income of the carrier. Similarly, in Missouri Pacific Railway Co. v. Nebraska, 217 U. S. 196 [30 Sup. Ct. 461, 54 L. Ed. 727, 18 Ann. Cas. 989], it was held that the carrier could not be required to build mere private connections, and the adequacy of the receipts from its entire business did not enter into the question. And this was so because the obligation was not involved in the carrier's public duty and the requirement went beyond the reasonable exercise of the state's protective power. * * * The state insists that the enactment of the statute may be justified as 'a declaration of public policy.' In substance, the argument is that the rate was imposed to aid in the development of a local industry, and thus to confer a benefit upon the people of the state. The importance to the community of its deposits of lignite coal, the infancy of the industry, and the advantages to be gained by increasing the consumption of this coal and making the community less dependent upon fuel supplies imported into the state, are emphasized. But, while local interests serve as a motive for enforcing reasonable rates, it would be a very different matter to say that the state may compel the carrier to maintain a rate upon a particular commodity that is less than reasonable, or—as might equally well be asserted—to carry gratuitously, in order to build up a local enterprise. That would be to go outside the carrier's undertaking, and outside the field of reasonable supervision of the conduct of its business, and would be equivalent to an appropriation of the property to public uses upon terms to which the carrier had in no way agreed. * * * The constitutional guaranty protects the carrier from arbitrary action and from the appropriation of its property to public purposes outside the undertaking assumed; and where it is established that a commodity, or a class of traffic, has been segregated, and a rate imposed which would compel the carrier to transport it for less than the proper cost of transportation, or virtually at cost, and thus the carrier would be denied a reasonable reward for its services after taking into account the entire traffic to which the rate applies, it must be concluded that the state has exceeded its authority."

What the effect of these late decisions by the Supreme Court, approving the doctrine announced in Lake Shore & Michigan Southern Railway Co. v. Smith, supra, and distinguishing and construing its own previous opinions in St. Louis & San Francisco Ry. Co. v. Gill, 156 U. S. 649, 15 Sup. Ct. 484, 39 L. Ed. 567, and Minneapolis & St. Louis R. R. Co. v. Minnesota, 186 U. S. 257, 22 Sup. Ct. 900, 46 L. Ed. 1151, may be upon the extent of the power of the state to require and

prescribe commutation rates generally, it is unnecessary to anticipate. It seems clear that that right cannot be created by local public demand or interest; that it cannot be justified by the Commission's views of the probable beneficial effects of such rates upon the company's business, because that would constitute an invasion of the right of the company to conduct and manage its own affairs, subject to a proper exercise of the power of regulation. What other carriers have done, or have been required to do, under different conditions and in different localities, cannot be accepted as contolling. It must at least appear that the net aggregate return to the carrier is just, fair and reasonable; and this does not appear, to our satisfaction, from the statement of the Commission itself.

The power and duty of this court to determine whether the constitutional rights of the complainant have been denied to it is and must be conceded. We think an actual test of the effect of these rates upon the business of complainant would be ineffective, because during the pendency of this litigation, and while the ultimate outcome must be uncertain, there could be no appreciably increased settlement of the suburban districts affected. If, on the other hand, people should be induced to take up such suburban residences upon the faith of rates thus temporarily established, a subsequent adverse decision would work an apparent injustice.

We recognize that this is not a hearing on the merits. The pleadings have not been made up, nor has testimony been taken. It is not intended by the foregoing expression of views to forecast the judgment of the court on final hearing. However, the situation presented, in our opinion, calls for the issuance of a temporary injunction. The court will receive from counsel suggestions respecting the terms of an appropriate order in conformity with the views herein expressed.