## LANDON et al. v. COURT OF INDUSTRIAL RELATIONS OF STATE OF KANSAS et al.

(District Court, D. Kansas, First Division. December 24, 1920.)

No. 136–N.

1. Equity ⬤═296—Supplemental bill held proper to determine reasonableness of rates established pending suit.

Where, pending a suit by the receivers of a natural gas supply company against the Court of Industrial Relations of a state and the several gas distributing companies and municipalities served by them, the Court of Industrial Relations had entered a new order establishing a different rate, the court can entertain in the same proceeding a supplemental bill by the defendant distributing companies to determine the reasonableness of the new rate.

2. Gas ⬤═14(1)—Industrial Relations Court can fix standard of natural gas leakage.

Under Laws Kan. 1911, c. 238, §§ 10, 13, 14, 16, 22, 41, empowering the Public Utilities Commission to fix reasonable rates for public utilities and to require reasonably efficient service, and sections 2, 4, 6, and 26 of the act creating the Kansas Court of Industrial Relations, giving the court the

powers of the Public Utilities Commission and additional powers, the Court of Industrial Relations has power to fix a standard for leakage in the plants of companies distributing natural gas.

3. **Gas** ⊜⟶14(1)—**Fixing leakage standard for natural gas not an invasion of companies' rights.**

An order of the Kansas Court of Industrial Relations fixing the standard for leakage in the plants of natural gas distributing companies is a proper exercise of the power of regulation of such companies, not an invasion of their right to manage their own affairs, which right is subject to such regulation.

4. **Gas** ⊜⟶14(1)—**Companies can be required to maintain higher standard against leakage than is to their interest.**

Since the prevention of leakage of natural gas is a matter of conservation in the interest of the consumers, rather than a matter affecting the distributing companies, the Court of Industrial Relations can require the companies to maintain a more efficient standard for leakage in their plants than it is to the financial interest of the companies to maintain.

5. **Public service commissions** ⊜⟶7—**Efficiency of plant is prerequisite for reasonable rate.**

The efficiency of the plant of public utility is a prerequisite to a demand for a reasonable rate for its services.

6. **Public service commissions** ⊜⟶7—**Deferred maintenance not compensated by increased rates.**

As a general rule, deferred maintenance of a public utility should not be paid for by increasing rates to consumers, but should be borne by the utility which is responsible for the expense.

7. **Gas** ⊜⟶14(1)—**Expense of bringing plant to new efficiency standard compensated by higher rates.**

Where a Court of Industrial Relations required gas distributing companies to bring their plants to a greater standard of efficiency against leakage than had been required in the past, the cost of bringing the plants to that standard is not a matter of deferred maintenance, but can be compensated, in so far as not due to faults of the companies, by increased rates.

8. **Gas** ⊜⟶14(1)—**Companies can be penalized in rates for diversion of maintenance funds.**

Where a public utility wrongfully diverted funds allowed it for maintenance to other uses, it may be penalized for such diversion by reduction of rates below the amount reasonably necessary to bring the plant up to an efficient standard and to pay reasonable return on investment.

9. **Gas** ⊜⟶14(1)—**Rate allowed by Court of Industrial Relations held confiscatory.**

The 80-cent rate, which the Kansas Court of Industrial Relations permitted companies distributing natural gas to charge, *held* unreasonable, unjust, and confiscatory, where the evidence showed that the rate would not produce a fair return on the valuation found by the commission, without any allowance for the expense of bringing the distributing plants to a new standard of efficiency required by the same order, and did not show that the rate would be reasonable after the plants were brought to the new standard.

10. **Public service commissions** ⊜⟶7—**Court, in determining reasonableness of rate, will not fix valuation.**

It is not within the province of the court, in passing on the reasonableness of a rate allowed by a state Court of Industrial Relations, to fix the valuation of the property employed in the public service.

11. **Public service commissions** ⊜⟶7—**Prevailing price should be considered in valuation.**

The original cost of the plant of a public utility, less theoretical depreciation, is not approved as the controlling basis for determining the

⊜⟶For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

valuation of property employed in the public service, but the cost of reproduction new at prevailing prices should be carefully considered, with other elements, in reaching a reasonable valuation.

12. **Public service commissions ⊂⇒7—Depreciation should be actually determined, not theoretically estimated.**

Depreciation in a public utility plant should not be measured by a theoretical yardstick, but should be determined by a careful consideration of the actual facts touching the physical condition of each plant under consideration.

13. **Gas ⊂⇒14(1)—Funds for repairs to increase efficiency cannot be taken from depreciation reserve.**

A gas company, which is ordered to bring its plant to an increased standard of efficiency, cannot be required to take the funds for that purpose from its accumulated depreciation reserve, which would be in effect confiscatory of the property.

14. **Gas ⊂⇒14(1)—Funds for repairs to increase efficiency should not be raised by borrowing.**

The funds necessary for repairs to bring a gas distributing plant to the new standard of efficiency required by the Court of Industrial Relations should not be raised by borrowing, which would add to the capital valuation of the plant, on which the company would be entitled to reasonable returns during its future operations.

15. **Gas ⊂⇒14(1)—Funds for repairs to increase efficiency can only be taken from companies to extent of deficiency of proper funds.**

Where a gas-distributing plant was deficiently constructed in the first place, or was not kept up to the recognized standard of efficiency, and earnings which might have been devoted to that purpose were diverted, the distributing companies can be penalized to that extent in raising the funds to bring their plants to a new standard of efficiency; but it would be unreasonable, within Laws Kan. 1911, c. 238, § 21, to go beyond that and throw upon them the whole burden of bringing their plants up to the new standard.

16. **Gas ⊂⇒14(1)—Consumers can be reasonably required to pay increased rate for reducing leakage.**

Since the reduction of leakage in a natural gas distributing plant is a matter of conservation in the interest of the consumers, who will be required to use other fuels when the supply of natural gas is exhausted, it is not unreasonable to include in the rate they must pay a charge for bringing the plants to a higher standard of efficiency, and thereby reducing the leakage, so long as natural gas under such rates is still cheaper than any other available fuel.

In Equity. Suit by John M. Landon and another, as receivers of the Kansas Natural Gas Company, against the Court of Industrial Relations of the State of Kansas and others. On hearing on supplemental answers in the nature of applications by the defendant gas distributing companies for a decree setting aside the order of the Court of Industrial Relations, denying the petitions of the distributing companies for an increase in rates, and establishing a standard of leakage. Order held unreasonable and confiscatory, in so far as it denied the increased rates, and the enforcement of that portion enjoined.

See, also, 245 Fed. 950; 269 Fed. 411, 423.

Chester I. Long, of Wichita, Kan., John H. Atwood, of Kansas City, Mo., and Robert Stone, of Topeka, Kan., for John M. Landon, receiver.

T. S. Salathiel, of Independence, Kan., and Robert A. Brown, of St. Joseph, Mo., for Kansas Natural Gas Co.

⊂⇒For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

John J. Jones, of Wichita, Kan., for George F. Sharitt, receiver.

Charles Blood Smith, of Topeka, Kan., for Fidelity Title & Trust Co.

Fred S. Jackson, of Topeka, Kan., for Public Utilities Commission of Kansas and its members.

J. W. Dana, of Kansas City, Mo., for Kansas City Gas Co., Wyandotte County Gas Co., and Citizens' Light, Heat & Power Co. of Lawrence.

James D. Lindsay, of Jefferson City, Mo., for Public Service Commission of Missouri.

C. A. Loomis, of Kansas City, Mo., for Jackson County Gas Co., Gardner Gas Co., Edgerton Gas Co., Wellsville Gas Co., Anderson County Light & Heat Co., Richmond & Princeton Gas Co., Baldwin Gas Co., Kansas Farmers' Gas Co., Ottawa Gas & Electric Co., Western Gas & Light Co., Wier Gas Co., and Parsons Gas Co.

T. F. Doran, of Topeka, Kan., for L. G. Treleaven, receiver.

Edward Sapp, of Galena, Kan., for Macon Gas Co.

W. E. Brown, of Atchison, Kan., for Atchison Ry. Light & Power Co.

Floyd Harper, of Leavenworth, Kan., for Leavenworth Light, Heat & Power Co.

H. J. Smith, of Kansas City, Kan., for Kansas City, Kan.

R. B. Caldwell, of Kansas City, Mo., for Kansas Gas & Light Co. and Home Light & Power Co.

E. W. Clausen, of Atchison, Kan., for city of Atchison.

B. F. Bowers, of Ottawa, Kan., for city of Ottawa.

L. V. Stigall and Charles L. Crowley, both of St. Joseph, Mo., for city of St. Joseph.

M. A. Fyke, of Kansas City, Mo., for Kansas City, Mo.

W. E. Ziegler, of Coffeyville, Kan., for Coffeyville Gas & Fuel Co.

H. H. Diechler, of Coffeyville, Kan., for city of Coffeyville.

T. M. Vrady, of Parsons, Kan., for city of Parsons.

George P. Hayden and H. O. Corwine, both of Topeka, Kan., for city of Topeka.

F. S. Jackson, of Topeka, Kan., for all Kansas cities not otherwise represented.

BOOTH, District Judge. The above cause comes on for hearing upon the supplemental answers in the nature of applications by several distributing companies on the line of the receiver of the Kansas Natural Gas Company for a decree setting aside the order made by the Court of Industrial Relations, dated August 18, 1920, which denied the petitions of said distributing companies for leave to increase the present 80-cent rate for natural gas, and ordered them to reduce the leakage in their respective systems to a standard of 200,000 cubic feet per annum per mile of 3-inch main equivalent. Any objection that might be raised to proceeding by supplemental answer in the pending suit, instead of by original bills in separate suits, as well as all objection to time for pleadings and manner of bringing the matter on for hearing, have been expressly waived by written stipulation between the parties.

[1] When closely analyzed, the controversies involved are found to

be simply a new phase of one of the controversies involved from the first in suit 136–N—a new phase arising subsequent to the commencement of that suit, but during the pendency thereof. In view of the foregoing facts, I am of opinion that the jurisdiction of this court has been properly invoked in the above-entitled suit.

In view of the decision of the Supreme Court in this suit (249 U. S. 236, 39 Sup. Ct. 268, 63 L. Ed. 577), it was deemed necessary for the receiver of the Kansas Natural Gas Company to change the method of charging for gas furnished by him to the several distributing companies on his line from a proportional part of the consumer's price, then 80 cents, to a price fixed at the city gates of the respective cities served by the distributing companies. The change was made by the receiver, under the direction of this court; a 35-cent city gate rate order was made July 14, 1919. That order was suspended before going into effect, but was finally reinstated by order dated January 20, 1920, effective March 25, 1920. The rate to be charged by the distributing companies to the consumer became, consequently, a matter for determination by the Court of Industrial Relations of Kansas and the Public Service Commission of Missouri and the distributing companies themselves in their respective jurisdictions.

Various steps were taken by the several distributing companies. In Ottawa, Kan., the distributing company and the city, with the consent of the Court of Industrial Relations, entered into a contract with the receiver inaugurating in that city the so-called three-part rate, consisting of a customer charge, a charge based upon maximum hourly demand, and a charge for gas actually delivered to the consumer. July 1, 1920, in Kansas City, Mo., with the approval of the Public Service Commission of that state, a schedule was put in having a gas charge of 80 cents, and a service charge of 50 cents minimum, and ranging upwards, dependent on the size of the meter.

Meanwhile, on its own initiative, the Court of Industrial Relations began an "investigation of gas rates of the distributing companies supplying gas at Topeka, Oakland, Kansas City, Kansas, Rosedale, Leavenworth, and other cities obtaining their supply of gas from the pipe lines of the receiver of the Kansas Natural Gas Company and subsidiary companies situated in eastern Kansas." Somewhat later several of the distributing companies on different dates filed applications with said Court of Industrial Relations for increase of rates to be charged consumers, for a determination of the amount which was reasonable for the distributing companies to pay the receiver for gas furnished by him; and for determination, also, of various matters of regulation and practice. The distributing companies so filing applications were the Atchison Railway, Light, Heat & Power Company, the Leavenworth Light, Heat & Power Company, L. G. Treleaven, receiver of the Consumers' Light, Heat & Power Company of Topeka, the Wyandotte County Gas Company, and the Public Utilities Company of Ft. Scott.

Hearings were had before the Court of Industrial Relations, and on August 18, 1920, an order and an opinion were handed down, disposing of all of the cases together. It is this order which the distributing companies have challenged by their supplemental pleadings in the

present suit, and in reference to which the present hearing has been had.

The order in question was of a fourfold character: First, it adopted as a basis of leakage allowance to the various distributing companies 200,000 cubic feet per annum per mile of 3-inch main equivalent, and directed that the distributing companies should immediately take all necessary measures to put their lines in condition to reduce the leakage to that standard; second, it regulated the supplying of industrial gas; third, it approved the rate of 35 cents per 1,000 cubic feet to be paid by the distributing companies to the receiver as a not unreasonable item of operative cost; fourth, it approved the rates then in effect (80 cents for the applicants), and denied the applications of the distributing companies for permission to increase said rates.

The parts of the order providing for the 35-cent city gate rate as an item of operating cost, and regulating the supplying of industrial gas, are not attacked by the distributing companies in their present applications. The first and fourth provisions of the order are both attacked; the first as being beyond the jurisdiction and power of the Court of Industrial Relations to make, and both the first and fourth as being confiscatory of the properties of the several distributing companies, and as being unreasonable.

[2] The powers of the Court of Industrial Relations are defined in chapter 238 of the Laws of 1911 of Kansas, creating the Public Utilities Commission, and also in the act establishing the Kansas Court of Industrial Relations, passed in 1920. Section 10 of chapter 238 provides:

"Every common carrier and public utility governed by the provisions of this act shall be required to furnish *reasonably efficient* and sufficient service, joint service and facilities for the use of any and all products or services rendered, furnished, supplied or produced by such public utility or common carrier. * * *"

Section 13 provides:

"It shall be the duty of the commission, either upon complaint, or upon its own initiative, to investigate all rates, joint rates, fares, tolls, charges and exactions, classifications or schedules of rates, or joint rates and rules and regulations, and if a.ter full hearing and investigation the commission shall find that such rates, joint rates, fares, tolls, charges or exactions, classifications or schedules of rates or joint rates, or rules and regulations, are unjust, unreasonable, unjustly discriminatory or unduly preferential, the commission shall have power to fix and order substituted therefor such rate or rates, fares, tolls, charges, exactions, classifications or schedules of rates or joint rates and such rules and regulations as shall be just and reasonable. If upon any investigation it shall be found that any regulation, measurement, *practice, act or service* complained of is unjust, unreasonable, *unreasonably inefficient*, insufficient, unduly preferential, unjustly discriminatory, or otherwise in violation of any of the provisions of this act or of the order of this commission, or if it be found that any service is inadequate or that any reasonable service cannot be obtained, the commission shall have power to substitute therefor such other regulations, measurements, practices, service or acts, and to make such order respecting any such charges in such regulations, measurements, practices, service or acts as shall be just and reasonable. * * *"

## Section 14 provides for investigations as to whether—

"any regulation, practice or act whatsoever affecting or relating to any service performed or to be performed by such public utility or common carrier for the public, is in any respect unreasonable, unfair, unjust, *unreasonably inefficient*, insufficient," etc., "or that any service performed or to be performed by such public utility or common carrier for the public, is unreasonably inadequate, inefficient, unduly insufficient or cannot be obtained. * * *"

## Section 16 provides:

" * * * And if it shall be found that any regulation, practice or act whatsoever, relating to any service performed or to be performed by such public utility or common carrier for the public in any respect unreasonable, unjust, unfair, *unreasonably inefficient*, insufficient * * * the Public Utilities Commission shall have full power, authority and jurisdiction to substitute therefor such other regulations, practice, service or act as they find and determine to be just, reasonable and necessary."

## Section 22 provides:

"The commission may ascertain and prescribe for each kind of public utility governed by the provisions of this act, suitable and convenient standard commercial units of products in service."

## Section 41 provides:

*Rule for Construing Statute.*—"The provisions of this act and all grants of power, authority and jurisdiction herein made to the commissioners, shall be liberally construed, and all incidental powers necessary to carry into effect the provisions of this act are hereby expressly granted to and conferred upon the commissioners."

## Section 2 of the act creating the Kansas Court of Industrial Relations (Laws Kan. 1920, c. 29) provides:

"The jurisdiction conferred by law upon the Public Utilities Commission of the state of Kansas is hereby conferred upon the Court of Industrial Relations, and the said Court of Industrial Relations is hereby given full power, authority and jurisdiction to supervise and control all public utilities * * * doing business in the State of Kansas, and is empowered to do all things necessary and convenient for the exercise of such power, authority and jurisdiction. All laws relating to the powers, authority, jurisdiction and duties of the Public Utilities Commission of this state are hereby adopted and all powers, authority, jurisdiction and duties by said laws imposed and conferred upon the Public Utilities Commission of this state relating to common carriers and public utilities are hereby imposed and conferred upon the Court of Industrial Relations, * * * and in addition thereto said Court of Industrial Relations shall have such further power, authority and jurisdiction and shall perform such further duties as are in this act set forth."

## In section 4 of said act it is provided:

"Said court, in addition to the powers and jurisdiction heretofore conferred upon, and exercised by, the Public Utilities Commission, is hereby given full power, authority and jurisdiction to supervise, direct and control the operation of the industries, employments, public utilities, and common carriers in all matters herein specified and in the manner provided herein, and to do all things needful for the proper and expeditious enforcement of all the provisions of this act."

## Section 6 of the act provides:

"It is hereby declared and determined to be necessary for the public peace, health and general welfare of the people of this state that the industries, employments, public utilities and common carriers herein specified shall be

operated with *reasonable* continuity and *efficiency* in order that the people of this state may live in peace and security, and be supplied with the necessaries of life."

Section 26 provides:

"The provisions of this act and all grants of power, authority and jurisdiction herein made to said Court of Industrial Relations shall be liberally construed and all incidental powers necessary to carry into effect the provisions of this act are hereby expressly granted to and conferred upon said Court of Industrial Relations."

In view of the provisions of the statutes just cited, I am of the opinion that the Court of Industrial Relations had ample power to make that part of the order of August 18, 1920, which provided for a standard for leakage in the plants of the distributing companies.

[3] Counsel for the distributing companies take the position that this action of the Court of Industrial Relations in respect to a standard of leakage was an invasion of the right of the companies to conduct and manage their own affairs, and cite Kansas City, etc., Ry. Co. v. Barker (D. C.) 242 Fed. 310. That case held that a state commission is not authorized to make orders "which would constitute an invasion of the right of the company to conduct and manage its own affairs, subject to a proper exercise of the power of regulation." In my judgment that part of the order of the Court of Industrial Relations which establishes the standard of leakage comes within the qualifying clause, "subject to a proper exercise of the power of regulation," and is therefore not an invasion of the rights of the distributing companies.

[4] That the plants of the several distributing companies above mentioned were unreasonably inefficient and wasteful at the time of the making of the order of August 18, 1920, by the Court of Industrial Relations is beyond all question. The evidence is overwhelming to that effect, and there is little serious contention to the contrary. The standard of 200,000 cubic feet per mile of 3-inch main per annum is a reasonable and attainable standard, according to testimony given upon the hearing by expert engineers of high standing, both those called on behalf of the distributing companies and those called on behalf of the Court of Industrial Relations. It may be true that a more wasteful standard would result in better financial results to the distributing companies, and it may also be true that, if the matter were left to the distributing companies themselves, they would continue a more wasteful standard.

This change in the standard of leakage is for the purpose of conservation, and the consumers are as a matter of fact more interested in conservation than the distributing companies. When natural gas is exhausted, the companies will be distributing manufactured gas, and will be getting presumably a reasonable return for so doing, so that the change will be of comparatively little moment to them; but when natural gas is exhausted the consumers will suffer a distinct loss, which will never be recovered. The consumers, therefore, are vitally interested in conserving the natural gas as far as possible. The saving is ultimately for their benefit.

The Court of Industrial Relations stands between the distributing company and the consumers, and must act for both. That court was, in my judgment, not confined to taking into consideration the financial results to the distributing companies, but was fully justified in considering, also, the economic results to the general body of consumers, and the conclusion reached by that court as to the standard to be adopted was in my judgment amply supported by the evidence.

There remains to be considered that part of the order of August 18, 1920, which approved the 80-cent rate as fair and reasonable, and denied any increase. That the present 80-cent rate is noncompensatory and confiscatory under present conditions is clearly established by the evidence, and I do not understand that serious contention is made to the contrary. For example, a statement of the income and expenditures and net earnings of the Wyandotte County Gas Company for the year 1920, made up from seven months' actual experience and five months' estimated, and on the basis of paying 35 cents for gas at the gates of the city, shows net earnings for the year of $34,794. The valuation of its property used in the service is conceded by the Court of Industrial Relations to be over $1,750,000. No corrections that could reasonably be made in the figures of gross income and operating expenses would show a return of net earnings that would not characterize the present 80-cent rate as confiscatory. Similar statements of income and expenditures by the other distributing companies reveal similar situations.

But it is claimed by the Court of Industrial Relations that though the present 80-cent rate may be noncompensatory and confiscatory under present conditions, yet that such rate will be compensatory under the improved conditions demanded by the Court of Industrial Relations, and that those conditions are reasonably demanded from the distributing companies, and can be attained by them. This contention raises the broad question: What will be the financial effect upon the distributing companies of the order adopting the designated standard of leakage, combined with the denial of an increase of present rates? The Court of Industrial Relations takes the position (a) that the question is immaterial, or, at least, should not be considered; (b) or, if the question is to be considered, yet that the effect will not be such as to condemn the order as unreasonable or confiscatory. The Court of Industrial Relations contends that the question is immaterial, or is not to be considered, because (1) the distributing companies are in no position to ask any change in rate until their plants are brought to efficient condition; (2) that the bringing of the plants up to the required standard is simply a matter of deferred maintenance, and can properly have no bearing on future rates; (3) that the distributing companies have failed to use the money which they might have used for the purpose of reducing leakage, and therefore are in no position to ask for new funds.

[5, 6] The first and second of these points may be considered together. It is true, as a general rule, that efficiency of plant is a prerequisite to a demand for a reasonable rate. It is also true as a general rule that deferred maintenance should not be paid for by increas-

ing rates to consumers. In the case of Knoxville v. Knoxville Water Co., 212 U. S. 1, 29 Sup. Ct. 148, 53 L. Ed. 371, the court said:

"If, however, a company fails to perform this plain duty and to exact sufficient returns to keep the investment unimpaired, whether this is the result of unwarranted dividends upon overissues of securities, or of omission to exact proper prices for the output, the fault is its own. When, therefore, a public regulation of its prices comes under question, the true value of the property then employed for the purpose of earning a return cannot be enhanced by a consideration of the errors in management which have been committed in the past."

In Puget Sound Elec. Ry. Co. v. Com., 65 Wash. 75, 117 Pac. 739, Ann. Cas. 1913B, 763, it was said:

"A railroad company may properly charge its returns with an annual sum to provide for depreciation and replacement, and have such sum allowed in any determination of what is a proper return upon its investment; * * * but it cannot make the traffic of a future year bear all the burdens of the deterioration of past years, since each year should carry the burden of its own wear and tear, so that, when renewals became necessary, the burden is equally borne by all contributing features."

[7] But both of the rules above mentioned and also the citations above given all presuppose (1) that a standard of efficiency has been adopted, or, at least, recognized, by all the parties, and as a consequence that a standard of maintenance has also been adopted or recognized, to which standard the public utility company can reasonably be expected to conform; (2) that the utility company either had sufficient rates in past years to take care of such standard maintenance, or could have charged sufficient rates to take care of such standard maintenance, but neglected so to do. The evidence shows, however, that neither of these assumptions holds true in the instant case. The standard now ordered for leakage, while in my judgment feasible and proper, is a radical departure from the standard recognized by the Public Utilities Commission of Kansas in their decisions of July and December, 1915. Indeed, it appears quite probable from the evidence that the leakage in the distributing companies' plants for the year 1919 was not materially greater than for the year 1914; comparison being made on a basis of equivalent 3-inch main. It may be said that this change of standard should have been foreseen and provided for by the distributing companies in the early years of natural gas distribution. Quite possibly it was foreseen; nevertheless the distributing companies were not left at liberty to fix such rates as would provide for maintenance on the standard of leakage now ordered. For more than seven years the rates of the distributing companies to consumers have been fixed either by statute or by commissions and courts, and during all that period the rates have been insufficient to provide for operating expenses, depreciation reserve, and a just return upon fair valuation. It would seem, therefore, that the problem of bringing the plants of the distributing companies up to the leakage standard ordered is not so much a matter of deferred maintenance as a matter of deferred standard of maintenance.

[8] As to the diversion by distributing companies of moneys which had been provided them for the purpose of reducing leakage, the Court

of Industrial Relations was unquestionably right in taking this into consideration, and would doubtless be justified in penalizing the distributing companies therefor; but it should be remembered that the moneys so provided were but a fractional part of the amounts necessary to be expended in bringing the plants up to the standard now ordered.

[9] We pass to the consideration of the financial effect upon the distributing companies of the enforcement of the order as to the standard of leakage, coupled with the present 80-cent rate. For the year ending December 31, 1920 (the latter part of the year being estimated), as stated above, the Wyandotte County Gas Company shows net earnings of $34,794:

| | | |
|---|---:|---:|
| Total income ........................................... | | $720,409 |
| Operating expenses .................................... | $224,186 | |
| Depreciation .......................................... | 50,000 | |
| Cost of Gas .......................................... | 411,429 | 685,615 |
| | | |
| Net earnings ............................................. | | $ 34,794 |

The Court of Industrial Relations offered evidence tending to show that there would have been a saving to the company, if the leakage had been on the basis of the 200,000 standard, of $82,540. This, added to the $34,794, would give $117,334. It seems clear, however, from the evidence, leaving out of consideration for the moment any question of providing moneys with which to reach the 200,000 standard, that after its attainment the maintenance thereof would cost at least $30,000 more than the repair figures given in the statement for the year 1920. This would reduce the net earnings from $117,334 to $87,334.

The cost of bringing the plant up to the standard ordered will, according to the estimate of the expert engineer testifying for the Court of Industrial Relations, amount to $351,000; according to the testimony of the engineer for the Wyandotte County Gas Company, $378,000; and this sum would have to be expended during a period extending over two, and possibly three, years.

The valuation of the properties of the Wyandotte County Gas Company, as given by the engineer of the Court of Industrial Relations, is $1,764,511; as given by the expert engineer testifying on behalf of the company, at from $3,000,000, based upon 10-year period average prices, to $5,250,000, based upon 1920 prices. The capitalization of the Wyandotte County Gas Company, recently approved by the Kansas official authority, is as follows:

| | |
|---|---:|
| Bonds ............................................... | $1,548,000 |
| Stock ............................................... | 887,500 |
| | |
| Total ............................................... | $2,435,500 |

[10] It appears that no dividends have been paid during the past seven years. It is not the province of this court to determine what valuation should be placed upon the properties of the Wyandotte County Gas Company, but it should be pointed out that the method used by the engineer of the Court of Industrial Relations in arriving at his figures is not the method generally approved, either by the federal

courts in this circuit or elsewhere. The controlling basis of his valuation is original cost less theoretical accrued depreciation. In the recent case of Joplin & Pittsburg Ry. Co. v. Public Service Commission of Missouri (D. C.) 267 Fed. 584 (three judges, Stone, Circuit Judge, and Wade and Van Valkenburgh, District Judges, sitting), it was said:

"It appears upon the face of the report [of the commission] that great, if not undue, emphasis was laid upon the original cost of the property * * * at a period greatly antedating that with which this investigation must deal; nor can we say that the present period of high prices is so temporary or abnormal that it may practically be disregarded in arriving at the value of complainant's properties. No one can say what degree of depression may ultimately come, but it is reasonably certain that the cost of the properties now under consideration will never again approximate figures prevailing in the years before the World War."

This expression of opinion was doubtless based upon what was said in the case of Lincoln Gas Co. v. Lincoln, 250 U. S. 256, 39 Sup. Ct. 454, 63 L. Ed. 968. In the course of the decision the court used the following language:

"The court notices judicially that, principally owing to the war, costs of labor and supplies have advanced greatly since the ordinance was adopted, and largely since the case was last heard in the court below, and that annual returns upon capital and enterprise the world over have materially increased, so that what would have been a proper return for capital in gas plants and other public utilities a few years ago furnishes no safe criterion for the present or the future."

In the very recent case of St. Joseph Ry., Light, Heat & Power Co. v. Public Service of Missouri, in the Western District of Missouri, 268 Fed. 267, Judge Van Valkenburgh used the following language:

"The commission took the original cost when obtainable, and, when not obtainable, average prices for a fixed period of five years before war prices prevailed, going back approximately to the year 1910. It also allowed cost price for additions and betterments made since present prices have prevailed, but it appears that no improvements or betterments of consequence have been made since that time. * * * It is my judgment that the great weight of authority is against the adoption of a standard of original cost as a controlling basis for determining present value. The present fair value is the object to be attained. Nor do I think it permissible substantially to restrict the inquiry to a period antedating present cost prices. * * * It follows that the method of valuation adopted by the commission in the case at bar was wrong."

A very clear and able expression of like views, with a keen analysis of the subject, is to be found in the decision of Judge Learned Hand in Consol. Gas Co. of N. Y. v. Newton (D. C.) 267 Fed. 231. It seems from the evidence that the Court of Industrial Relations, in determining what would be a reasonable rate, based its computation upon valuations arrived at by a wrong method, which was sure to result in figures far below fair present value. Rates based upon such valuations would almost certainly be noncompensatory and practically confiscatory.

[11] While, as stated before, it is not the province of this court to fix the valuation, yet it may not be amiss to say that in my judgment cost of reproduction new, at the present time and at prevailing prices, should not be rejected, but carefully considered, together with the other elements, in reaching a "reasonable judgment, having its basis in a proper consideration of all relevant facts." Minn. Rate Cases,

230 U. S. 352, 434, 33 Sup. Ct. 729, 57 L. Ed. 1511, 48 L. R. A. (N. S.) 1151, Ann. Cas. 1916A, 18.

[12] It may also not be amiss to say further that in my judgment the element of depreciation should not be measured by a theoretical yardstick, but should be determined by a careful consideration of the actual facts touching the physical condition of each particular plant under consideration. In view of all the evidence, it is my judgment that the valuation of the properties of the Wyandotte County Gas Company, arrived at by a proper method, may be conservatively assumed to be $2,500,000, and, with an 8 per cent. return on the valuation, provision should properly be made for a return of $200,000. If the foregoing figures are even approximately correct, it seems clear that the present 80-cent rate, even with the saving under the new standard of leakage, would still be confiscatory.

In the foregoing discussion the evidence in the case of the Wyandotte County Gas Company, the largest of the applicant companies, has been specifically considered and the results stated. The evidence as to each of the other applicant distributing companies has, however, also been considered, and similar conditions found, and similar conclusions reached. Indeed, in some particulars the results as to the other distributing companies are more pronouncedly in their favor than in the case of the Wyandotte County Gas Company. It is contended, however, by counsel for the Court of Industrial Relations, that in any event the present 80-cent rate, when coupled with the new standard of leakage ordered, is not "unreasonable," within the meaning of that term as used in section 21, chapter 238, Laws Kan. 1911.

The case of Railroad Co. v. Utilities Commission, 95 Kan. 605, 148 Pac. 667, is cited as holding that the term "unreasonable" is not synonymous with "confiscatory." It would seem that counsel wish the inference drawn that the 80-cent rate may not be "unreasonable," even though it be confiscatory. In my opinion the case cited does not authorize such inference, but rather the quite different inference, viz. that the 80-cent rate may be "unreasonable," even though not confiscatory. Without regard, however, to which inference is correct, I am clearly of the opinion that the present 80-cent rate, even when coupled with the new standard of leakage ordered, is "unreasonable." And here, in addition to the matters already discussed, the question of ways and means is proper to be considered.

[13] With what funds shall the distributing companies place their plants upon the standard of leakage required by the order of August 18, 1920? Such funds cannot be derived from an accumulated depreciation reserve, for the reason that the evidence shows that there is no such fund in actual existence; nor, if there were, would it be proper to take the funds accumulated for that purpose to make the repairs necessary. Such a diversion of funds from the depreciation reserve would be in effect confiscatory of the property of the distributing companies. The required funds cannot be taken from net earnings, for, in case of several of the applicants, the net earnings are not sufficient at present for the purpose, even eliminating all question of return upon valuation.

[14] Nor is it reasonable, in my opinion, to demand that the funds to make the required repairs be raised by borrowed capital. Such funds so raised would necessarily have to go into the capital account. But the evidence shows that practically 90 per cent. of the work necessary to be done to bring the distributing plants up to the required standard consists in repairs, and not in new construction. There is no justification, therefore, for putting such expense into capital account, thereby making the public pay a rate indefinitely on such addition to the capital account.

[15] Of course if any plant was deficiently constructed in the first place, to the extent of that deficiency the company must look to itself for financial help. If during the past seven years the distributing companies have not kept their plants up to the standard of leakage tacitly authorized, and if earnings which might have been devoted to such purpose have been diverted, the distributing companies should be penalized to the proper extent therefor. And if money specifically provided to the distributing companies for the purpose of reducing leakage has been by them diverted in whole or in part to other purposes, the distributing companies should be penalized therefor to the proper extent. But to go far beyond this, and throw upon the distributing companies the whole burden of bringing their plants up to the new standard ordered, reasonable and proper though that standard be, is in my judgment "unreasonable," in view of the unusual, but vital, facts of the situation, within the meaning of that term as used in section 21, chapter 238, Laws Kan. 1911.

[16] It will doubtless be said that, if the foregoing views are correct, they point to the conclusion that the new standard of leakage can properly be attained only by some increase in the present rate. Be it so. Such conclusion is in my judgment both just and reasonable. As has been already said, the new standard of leakage is in the interest of conservation of gas—a matter in which the consumers are vitally interested, and it is not unreasonable that they should pay in part at least the cost of effecting the change. It may not be amiss to repeat what was said two years ago, at the time of the entry of the 80-cent rate order:

"It may be said that this increase of rates is really making the public pay the expense of reducing the leakage. In a way this is true, and such a course, under some circumstances, might be open to objections; but such is not the case here. For some years the public has been receiving service from the distributing companies at a rate too low to give these companies a fair, reasonable return, with the natural result that repairs and replacements have not received sufficient attention. Secondly, the rates now established are still much below what the natural gas is intrinsically worth, when compared with other fuel which might be substituted."

My conclusion on the present applications is that that portion of the order of August 18, 1920, of the Court of Industrial Relations which denies the applications of the distributing companies to increase the present rate, and fixes the present 80-cent rate as reasonable, just, and fair is unreasonable and confiscatory, and the enforcement of the same should be enjoined.

Decree may be prepared in accordance with the foregoing views.