No. 25,440.

THE COFFEYVILLE GAS & FUEL COMPANY, *Appellee,* v. THE PUBLIC
UTILITIES COMMISSION OF THE STATE OF KANSAS et al., *Appellants.*

SYLLABUS BY THE COURT.

1. INJUNCTION—*Action to Enjoin Enforcement of Gas Rate Fixed By Public Utilities Commission—Valuation of Plant as a Rate Base.* On an appeal from a judgment setting aside a rate because it is confiscatory, it is unnecessary to inquire as to the elements entering into a valuation of the plant of a utility as a rate base, where there is an agreement of the parties as to such valuation.

2. SAME—*Gas Rates for Domestic Use Should Be Higher Than Rates to Industrial Plants.* In determining what is a reasonable rate for gas supplied by a utility, consideration should be given to the cost of the producing or obtaining of gas for distribution, and it is held that under the evidence there were good reasons for allowing a higher price for gas supplied for domestic use with the varying demands of consumers than for that supplied and sold to industrial plants where there is steadiness of demand.

3. SAME—*Gas Rate Paid By Utility Was Reasonable.* The finding of the trial court that the price paid for gas by the utility was reasonable, is held to be sustained by sufficient evidence.

4. SAME—*Leakage of Gas in Excess of Standard Requirement—Apportionment of Leakage Equitable.* There was a leakage of gas in excess of a standard requirement, some of which was due to the fault of the utility, but the greater part thereof was not. The court found that in fixing a rate for the gas supplied, the utility was entitled to be allowed out of its earnings a sum sufficient to take care of one-half of the leakage. *Held,* that an apportionment of the leakage was warranted and that the evidence supports the finding made.

5. SAME—*Rate Fixed by Public Utilities Commission Found to be Confiscatory and Void—Former Authorized Rates Left in Force.* Where a utility furnishing gas under an authorized rate of 60 cents per thousand cubic feet, applies to the Public Utilities Commission for a compensatory and higher rate, and that tribunal refuses the application and instead orders the utility to supply gas to consumers at a rate of 50 cents per thousand, and in an action the latter rate is found and adjudged by the court to be confiscatory and void, the judgment of the court in setting aside the void rate leaves in force the former authorized rate of 60 cents per thousand, and it is competent for the court to so determine.

Appeal from Shawnee district court, division No. 2; GEORGE H. WHITCOMB, judge. Opinion filed May 10, 1924. Modified and affirmed.

*Fred S. Jackson,* of Topeka, *Maurice Murphy,* of St. Marys, and *A. R. Lamb,* of Coffeyville, for the appellants.

*A. M. Harvey, Randal C. Harvey, Paul L. Harvey,* all of Topeka, and *Fred Robertson,* of Kansas, City, for the appellee.

The opinion of the court was delivered by

JOHNSTON, C. J.: This proceeding was brought by the Coffeyville Gas & Fuel Company, to enjoin the enforcement of a rate fixed by the Public Utilities Commission to be charged for gas to the patrons and customers of the plaintiff. The injunction sought was granted and defendants appeal.

The company was organized in 1905, and had paid dividends every year except 1905, 1908 and 1913, and its books also showed that it lost money in the years of 1919 and 1920. Up to 1920 it had furnished gas to consumers at a rate of 50 cents per thousand cubic feet. Finding that it was operating at a loss it made an application to the commission for a higher rate and that tribunal authorized a temporary rate of 60 cents per thousand cubic feet. In July 1921, the question of rate was taken up again by the commission, and at a hearing it was decided that the 60-cent rate should be continued for a period of one year. The commission then found that the leakage was 45 per cent of the gas purchased, that the company had done little to reduce the leakage and just prior to that time the commission had fixed the maximum leakage at 200,000 cubic feet per mile of three-inch main. The company asked for a 50-cent customer's charge to use in reducing the leakage. This was not allowed, the commission finding that the 60-cent rate would be sufficient to provide a depreciation fund of $4\frac{1}{2}$ per cent, giving its stockholders a $4\frac{1}{2}$ per cent dividend, and it still would have about $30,000 to devote to the leakage problem. The order made was that a depreciation fund of $4\frac{1}{2}$ per cent should be set aside, to declare and pay a dividend of $4\frac{1}{2}$ per cent to its stockholders, and devote the balance of the net proceeds to the stoppage of leakage. Prior to the expiration of the year mentioned the company again applied to the commission for an increase in rate, asking 75 cents per thousand cubic feet or in lieu thereof a rate in excess of 60 cents and permission to make a service charge of $1 per month per customer. A hearing was had on this application, which resulted in an order made September 26, 1922, refusing the application. It was found by the commission that the reasonable value of the property of the company used in the business was $254,000, that the company now operating the system had paid $300,000 for the property, a sum held to be in excess of its value. A considerable portion of the price paid was said to be for going concern, and good will,

which the commission found have no place in a valuation for rate making. It therefore found and ordered that 3½ per cent was sufficient to produce a depreciation fund, that 7 per cent of the valuation of the property used and useful was a proper return on the investment, that 50 cents per thousand cubic feet would produce sufficient revenue to pay operating expenses and provide a depreciation fund and an ample return on the fixed valuation. The 50-cent rate established was made effective from and after the date of the order although the company was contending that the 60-cent rate was confiscatory.

The present action was brought in the district court to enjoin the rate so established by the commission, in which the testimony taken before the commission was received, as well as such additional testimony as the parties desired to offer. Upon this testimony the trial court made findings of fact as to the cost and value of gas purchased and depreciation and also loss from leakage. The court found that the reproduction cost based on prices prevailing in July, 1922, would be $393,837.09, that the reproduction cost at such prices less depreciation would be $297,635.94; that the original cost as shown by the company's books was $427,279.71, and that the total purchase price of the plant to the present owners was $336,-532.66. The court further found that the valuation placed upon property by the engineer of the commission was based on average prices for a period of ten years before the war, which was not depreciated, that it did not include the value of the company's real estate on which the office building stands, which is fairly worth $10,000. The commission it was found did include $4,000 for the estimated cost of new work on paved streets and that with this item and on the testimony the commission concluded that the plant was worth $254,000. These findings, except as to the purchase price, did not include anything for good will, franchise value, going concern value or cost of establishing business. The trial court decided to accept the valuation of the commission as a basis for determining the rate, adding only $6,000 on account of working capital, making a total of $260,000 upon which a rate should be figured, and then concluded that the company was entitled to set aside as a reserve for depreciation 4½ per cent on the valuation ($254,000 fixed by the commission), and to earn as a return on its investment 7 per cent on $260,000. In respect to the cost of gas, leakage depreciation and the rate necessary to a fair return on the investment, the following conclusions were made:

"10. The accountant for the commission submitted a statement of the plaintiff's operating income for the year ending June 30, 1922, basing the returns for June on the figures for June, 1921. The net returns after deducting $7,070.15 for leakage reduction expense and bringing the cost of gas purchased up to 30¢ per thousand cubic feet was $22,949.48 (Read Ex. No. 9). Adding one-half of the leakage expense to this would make the net returns $26,484.53. A depreciation of 4½ per cent on $254,000.00 would amount to $11,430.00 and a return on an investment of $260,000.00 at 7 per cent would be $18,200.00 or a total for both purposes of $29,630.00. A report made by accountant for the plaintiff changed Mr. Read's figures somewhat, but not materially (Ex. P-5), and for the purposes of this case the latter will be used. The figures contained in Read's Ex. No. 9 are based on returns under a 60¢ rate for gas. Under the 50¢ rate fixed by the order of September 26, 1922, a reduction in receipts would have to be made of over $30,000.00. It does not appear probable that the consumption of gas would be appreciably increased by a reduction of the rate. The evidence is to the contrary. It appears from evidence offered by the plaintiff (Ex. P-6) that at a 50¢ rate for the year ending June 30, 1922, and allowing all of the cost of reduction of leakage and other operating expenses, nothing would have been available for depreciation and return but that a loss would have been sustained of $20,574.31. Deducting one-half of the leakage expense, figured at $4,098.28, the loss would have been $16,476.03. In Exhibit P-8 offered by the plaintiff the same figures are given based on the expense and depreciation figures of the commission's accountant, the only changes being the substitution of actual expenses for June, 1922, for those of June, 1921, given in those figures. It appears from this exhibit that after deducting leakage expenses of $7,070.15 there would have been nothing left for depreciation and return but instead there would have been a loss of $1,529.68, or if one-half of the leakage be allowed as expenses ($3,535.07) the amount for depreciation and return would have been $2,005.40."

"11. It may be observed that, as found by the commission, it appears that in furnishing gas to the customers of the plaintiff company there is a leakage largely in excess of the standard of 200,000 cubic feet per mile per year of 3-inch equivalent fixed by the commission. It is doubtless true that so large a leakage of gas is due in part to the fault of the company in not previously maintaining a higher standard but it does not appear that the company has had such sufficient notice of this rather recently-established standard that it can be fairly said that the whole reduction of leakage is a matter of deferred maintenance. As nearly as can be determined the company should be allowed enough to take care of at least one-half of the expense of reducing leakage to the required standard."

"12. It is stated in the order of the commission of September 26, 1922, in question here that a reduction of the leakage of gas to the standard set by the commission would result in a saving of $30,712.00 over and above the apparent cost of gas for the twelve months preceding the hearing before the commission. In the report of the leakage engineer made for the eleven months during which the leakage campaign was carried on—August 1, 1921, to June 30, 1922 (Ex. P-4)—it is stated that 19 per cent of the leakage work had been completed on an actual mileage basis and 15 per cent completed on a 3-inch

Gas & Fuel Co. v. Public Utilities Commission.

equivalent basis. The total leakage for the year was 28.35 per cent of all the gas purchased; for the six months ending December 31, 1921, the percentage was 37.98 per cent and for the next six months 21.47 per cent (Ex. P-5). If. the company is to be charged with all of the loss from leakage above the standard of 200,000 cubic feet per mile of 3-inch equivalent or is required to assume the responsibility therefor, the same as if that much additional income had been derived or expense saved, there would be a sufficient net return to allow the setting aside of 4½ per cent for depreciation and the payment of more than 7 per cent as return on the investment. How far the leakage survey has proceeded since June 30, 1922, does not appear from the evidence and the court has no information on that point as to what actual results have been obtained. It seems clear, however, as in the case of requiring the company to pay all the cost of leakage reduction, that the company cannot be fairly held to a rule of this kind and it would not be just to put the same in force on July 1, 1922, or as of the date of the order of September 26, 1922, in view especially of the recent setting up of the standard. The evidence does not disclose that all or the greater part of the leakage is due to the fault of the company, or that the company was managed in this respect in any way different from that of similar companies. However, it is the judgment of this court that the leakage was excessive and should not have been allowed to continue at so high a figure. Even if the company should be held responsible for one-third or even one-half of this loss their returns at a 50¢ rate would not be adequate."

"13. About one-half of the gas used by the plaintiff is purchased from the Kansas Natural Gas Company and the other half is local gas purchased from the M. T. C. and Elbukan companies. Receivers are in possession and control of the property of the last two corporations, including all of the capital stock of the plaintiff company, appointment having been made during the pendency of this suit. During the year ending June 30, 1922, the plaintiff paid 30¢ per thousand cubic feet for gas purchased from the Kansas Natural Gas Company but paid a somewhat lower rate for other gas purchased, making the average rate paid by it during the year for gas 27.58¢ per thousand cubic feet. During the latter part of said year the M. T. C. and Elbukan companies increased their rate to the plaintiff for gas purchased to 30¢ per thousand cubic feet, so that if the plaintiff continues to secure its gas from the same source in the future it probably will be required to pay 30¢ per thousand cubic feet for all gas purchased. This would increase the annual expense of the plaintiff over that of the year ending June 30, 1922, about $11,800.00. While the purchase of gas by the plaintiff company from the M. T. C. and Elbukan companies or its receivers, the holders of all of the stock of plaintiff, is subject to criticism and the circumstances of such purchase should be closely scrutinized, because a proper relation of seller and purchaser can not exist under such conditions, there is no evidence of any bad faith on the part of any of the officers of any of the companies concerned in regard to the price paid for gas. The order of September 26, 1922, contains this clause: 'Considering all the circumstances in connection with this gas the commission finds the fair and reasonable price therefor is 20¢ per thousand cubic feet and this commission will so compute the same in arriving at a basis as to rates in this case.' As

already stated, the evidence submitted in this case does not warrant a finding that gas can be purchased at 20¢.'

"14. Industrial gas is sold and is purchased by a number of industrial consumers in large quantities in and about the vicinity of Coffeyville at rates varying from 17½¢ to 25¢ per thousand cubic feet and a reasonable rate for such industrial gas is around 20¢ per thousand. The plaintiff cannot secure gas at as low a rate as it is secured by industrial concerns for the reason that the latter take about the same amount of gas during the entire year and their demand does not fluctuate, as does that of the plaintiff company furnishing gas for domestic use from day to day; nor does it fluctuate during the different seasons of the year, on account of the weather, nor from time to time during each day as in the case of the plaintiff. It appears from the evidence that the distributors of industrial gas would be unable to supply the plaintiff company so as to meet the demand of the latter at peak load periods nor with sufficient regularity and volume to be dependable for domestic purposes, and the plaintiff would be unable to furnish efficient and sufficient service to its customers if dependent upon gas from such sources."

"15. The evidence introduced upon the subject shows that the market price of gas sold to a distributing company such as the plaintiff should bring from 10 to 12 cents per thousand cubic feet more than that sold to a user for industrial purposes. The managing officers of the plaintiff company in the exercise of their business judgment have contracted to purchase its supply of gas at 30¢ per thousand cubic feet and are paying that at the present time. No evidence has been introduced to show that the plaintiff can secure gas for its purposes at a lower rate. The court therefore finds under all the evidence that the rate of 30¢ per thousand cubic feet paid by the plaintiff for gas purchased by it is not unreasonable."

Most of the testimony and the principal contentions of the parties related to and centered on the valuation which should be placed upon the plant of the company as a basis for determining a fair rate or return on the investment. That question has been eliminated by the action of the trial court in practically adopting and using the valuations fixed by the commission as a basis for its judgment. From the facts found, it would appear that the appealing defendants, at least, have no cause to complain of the basis adopted, and we find no occasion to consider or review the rules adopted as to the conceded valuation.

There is complaint as to the cost paid by the company for the gas furnished its consumers, to the problem of leakage, to the proper rate to be charged customers, and what are proper items to be considered as operating expenses. It appears that the company is paying 30 cents per thousand cubic feet for the gas which it is distributing to consumers. There was testimony that gas had been furnished and sold to industrial plants for from 20 to 25 cents per

thousand cubic feet, and it is argued that in determining a just return the company should not be allowed a credit for 30 cents. A great deal of testimony was produced as to the prices at which gas could be purchased in the vicinity of the plant and as to the difference between the price of gas supplied for domestic use and the price at which it was sold to industrial plants. That furnished for industrial purposes, it was shown, is for a fixed quantity day after day throughout the year, while that supplied for domestic use fluctuates in quantity and varies according to weather conditions and the needs of customers. Much more is used by domestic consumers in the morning from seven to ten o'clock and but little is used from that time until evening. The demand also varies according to the seasons. A heavy load must be carried in fall and winter, but a much lighter load supplies the needs of domestic consumers in the summer period. It was shown that the company is required to keep up a pressure that will meet the varying demands, and witnesses stated that when only a small quantity is used the gas is pushed into the pipes and there is a consequent greater loss from leakage. Other witnesses stated that the price of industrial gas is governed by the volume used and the steadiness of the demand, and that gas furnished intermittently for domestic use cannot be furnished at the price for which industrial gas is sold. The difference in cost, it was said by witnesses, is fundamental and recognized the world over, and a producer selling gas prefers to sell to an industrial user at 20 cents rather than to a domestic user at 30 cents. The testimony is to the effect that the difference in the cost of gas sold for the two purposes mentioned runs from ten to twelve cents per thousand feet. There is little dispute in the testimony as to this difference of cost, and on the evidence the court found and was warranted in finding, that the market price of gas for domestic purposes was from ten to twelve cents more than that sold for industrial purposes, that the managing officers of the company have contracted for and are now paying 30 cents per thousand feet, that it was not shown that gas could be purchased at a less price, and that the price paid was not unreasonable.

It is argued that two of the companies which furnish gas to the plaintiff at the price named own stock in the plaintiff company, but it appears that one-half of the gas purchased by the plaintiff was obtained from another company which had no interest in the plaintiff company, and that the price paid was the same to all. It

cannot be held that there was bad faith in the purchase of gas from these companies. Whether the price paid for the gas purchased was an unreasonable one was a question of fact for the determination of the trial court, and its finding thereon seems to be well supported by the evidence.

It is insisted by defendants that what is called leakage should not be considered in determining what is a reasonable rate or return on the investment. It appears that there was an excessive leakage which was due in part to the fault of the company. It is conceded that under the ordinary systems of distribution of gas there is necessarily considerable waste through leakage. This was recognized in fixing a standard of leakage and in authorizing the company to devote a certain proportion of its earnings to the reduction of leakage. In 1921, the commission acquiesced in the application of $30,000 of the company's net returns to the leakage problem. It, of course, was the duty of the company to maintain its plant in a reasonable condition of efficiency, and while the standard fixed by the commission for leakage was recent and experimental it cannot be said that it is an unreasonable requirement. The work of reducing leakage can only be accomplished from the returns earned, and if there are no earnings for a period there will necessarily be deterioration of the utility and deferred maintenance. It was shown that the plant which was constructed about eighteen years before the trial was in seventy-five per cent condition and doubtless that fact entered into the valuation placed upon the property. In this period the company had passed dividends for three years, and as its books showed, lost money in the additional years of 1919 and 1920. The company was under the supervision of the commission in this period and it had required the company to reduce leakage early and as nearly as possible to the adopted standard. This the company proceeded to do in June, 1922, and had gone over nineteen per cent of the lines, and according to the witnesses had expended in the leakage campaign about $13,000, reducing the leakage from about forty-five per cent to twenty-one and forty-seven one-hundredths per cent. Considerable time is necessary to accomplish this work, and especially in the paved sections of the city. It was shown that one-half of the leakage is in the service pipes on the premises of the consumers, and it appears that the company was carrying on this work with a reasonable degree of diligence in compliance with the order of the commission. The court

Gas & Fuel Co. v. Public Utilities Commission.

found that the greater part of the leakage was not due to the fault of the company. Both the company and consumers were interested in averting loss through leakage and in the continuance of the service. In *Landon v. Court of Industrial Relations*, 269 Fed. 433, the court, in treating of the subject and standard of leakage, said:

"This change in the standard of leakage is for the purpose of conservation, and the consumers are as a matter of fact more interested in conservation than the distributing companies. When natural gas is exhausted, the companies will be distributing manufactured gas, and will be getting presumably a reasonable return for so doing, so that the change will be of comparatively little moment to them; but when natural gas is exhausted the consumers will suffer a distinct loss, which will never be recovered. The consumers, therefore, are vitally interested in conserving the natural gas as far as possible. The saving is ultimately for their benefit." (p. 440.)

We think the court arrived at a fair conclusion when it found that the company should be allowed enough to take care of at least one-half of the expense of reducing the leakage to the required standard.

It was further contended that certain items of salaries and attorneys fees which had been paid by the company should be examined with caution before allowing them as operating expenses. No evidence was offered to show that the fees and expenses were unnecessary or unreasonable, nor any showing made that there was a lack of good faith in the litigation for which attorneys' fees were paid.

There was much evidence produced as to whether or not the rates fixed were fairly compensatory, taking into consideration the agreed valuation of the plant, the depreciation to be provided for and allowance made for leakage, as well as the expense of operation. It is clear from the evidence under any view taken of it, that the 50-cent rate would be noncompensatory and confiscatory. Indeed it tended to show that the 60-cent rate hardly afforded a fair net return on the investment. It is not practicable nor necessary to recite the evidence on the subject, but a reading of all of it satisfies us that the finding of the trial court to the effect that a 50-cent rate was unreasonably low and confiscatory, was well supported by the evidence.

After the trial court had announced its conclusion that the 50-cent rate was void, the company was proceeding to put in a 65-cent rate and a service charge of 75 cents per month to each consumer. While the motion for a new trial was pending the defendants, who

were preparing for an appeal, asked the court to restrain the enforcement of a higher rate than the one in force when the 50-cent rate was ordered by the commission. This was not done, but when the appeal was taken this court, upon application of the defendants, ordered that pending the appeal no higher rate than 60 cents should be charged. This order has been observed by the company.

It is contended by the plaintiff that when the judgment annulling the 50-cent rate was ordered by the commission, no lawful rate existed, and that the company was entitled to put in a rate of its own, which should be deemed authoritative until set aside by the commission. The defendants insist that the 60-cent rate in force when the 50-cent rate was set aside is applicable and should be applied until a different one is established by the commission. Ordinarily when a rate is set aside by a competent court the utility is at liberty to promulgate a rate of its own, which should be deemed a legal rate until a different one is authorized and established by the commission. (*City of Hutchinson v. Bell Telephone Co.*, 109 Kan. 545, 200 Pac. 301.) This case is in a somewhat different attitude. The application of the company was for a rate higher than 60 cents. Instead of allowing an increased rate the commission ordered a reduction to 50 cents. The order for a 50-cent rate has been found to be invalid, and the order being a nullity, it left in force the 60-cent rate under which the company was operating when the order was made. That was the view taken by this court when the company was restrained during the pendency of the appeal from charging more than the rate authorized by the commission, and which was in force when the invalid order of reduction was made. Whether that rate is too high or too low at the present time is a question for the commission to determine upon application of either party.

There was some discretion in the court as to the granting of the injunction, and we are of the opinion that the judgment should be and is modified to the extent that a greater rate shall not be charged consumers than 60 cents, the one previously authorized by the commission until that tribunal, upon a hearing, finds and orders that a different rate should be established.

As modified the judgment is affirmed.

HARVEY and HOPKINS, JJ., not sitting.