**ARKANSAS LOUISIANA GAS CO. v. CITY OF TEXARKANA, ARK., et al.**

No. 10963.

Circuit Court of Appeals, Eighth Circuit.
April 13, 1938.

Rehearing Denied May 4, 1938.

J. Merrick Moore, of Little Rock, Ark., and William H. Arnold, Jr., of Texarkana, Ark. (Henry C. Walker, Jr., and William C. Fitzhugh, both of Shreveport, La., on the brief), for appellant.

Benjamin E. Carter, of Texarkana, Ark. (Willis B. Smith, of Texarkana, Ark., on the brief), for appellees.

Before GARDNER, SANBORN, and THOMAS, Circuit Judges.

GARDNER, Circuit Judge.

This is an appeal from that part of the decree entered below which sustained a certain schedule of gas rates as not confiscatory. The suit was brought in equity by appellant as plaintiff, to enjoin the enforcement of the gas rates prescribed by the City Council of Texarkana, Arkansas, and to restrain the officers of the city from interfering with the collection of rates promulgated by appellant. It will be convenient to refer to the parties as they were designated below.

The plaintiff owns and operates gas distribution plants at various towns and cities in Arkansas, Louisiana, and Texas. It owns leases and wells in producing gas fields in Eastern Texas, Northern Louisiana, and Northern Arkansas, from which it secures large quantities of natural gas, and it also purchases from other producers. This gas is transported through pipe lines, and delivered to the municipal border delivery stations to be distributed and sold, or is sold directly from its transmission pipe lines to large industrial consumers. Some gas is sold from its transmission pipe lines to serve distribution plants owned by other corporations.

Under the statutes of Arkansas, city councils are given power to regulate rates charged consumers of gas in the cities of that state. In 1923, the City Council of Texarkana, Arkansas, prescribed a rate of 50 cents per thousand cubic feet for the first 100,000 cubic feet or fraction thereof sold in any thirty-day period to any commercial or domestic consumer, and 22 cents per thousand for additional gas. A graduated scale of lower rates was prescribed for industrial consumers. The schedule provided for a 10 per cent. discount upon monthly bills if paid within ten days. This is referred to in the record as the 45-cent rate.

On May 30, 1930, on application of plaintiff, the City Council passed a resolution which made some increases in the rates. Referendum petitions were filed and an election held at which the voters of the city rejected the resolution. On October 23, 1933, plaintiff filed with the City Council an application for a change of rates, and asked that it be permitted to put into effect a sliding scale of rates as follows:

| For the first | 1000 cubic feet | $1.75 per thousand |
|---|---|---|
| For the next | 2000 cubic feet | .75 per thousand |
| For the next | 7000 cubic feet | .55 per thousand |
| Over | 10000 cubic feet | .35 per thousand |

with an additional 10 per cent. for failure to pay within ten days. Industrial consumers were to be served under special contract, the rates to be mutually agreed upon without discrimination.

On receipt of this application, the City Council, in accordance with the requirements of the Arkansas statute, fixed a time for hearing and gave notice that it would also consider whether or not a reduction in rates should be ordered. Hearings were accordingly held, and on December 22, 1933, the City Council made detailed findings and entered an order or resolution denying the application and declaring the proposed rates unreasonable and exorbitant, and ordered and directed plaintiff to con-

tinue the 1923 rates in effect. The hearing was continued for the purpose of further investigation and consideration of the question of reduction of rates.

On February 13, 1934, after further investigation, the City Council ordered plaintiff, after February 25, 1934, not to charge domestic and commercial consumers in excess of 45 cents per thousand cubic feet for monthly consumption up to 100,000 cubic feet, with a discount of 5 cents per thousand on bills paid within ten days. The order contained provision that, "Except as herein modified, the order embodied in the Resolution of December 22, 1933, shall remain in full force and effect." This is referred to in the record as the 40-cent rate, while, as above observed, the rate prescribed in 1923 is referred to as the 45-cent rate.

Plaintiff filed its bill of complaint in this cause on February 16, 1934, alleging, among other things: "That plaintiff is seeking herein to enjoin the defendants from enforcing the orders of the City Council of Texarkana, Arkansas, issued December 22nd, 1933, and February 13, 1934, and from interfering with plaintiff in its realization of proper charges for gas service furnished the consumers of Texarkana, Arkansas, upon the grounds that the said orders" are confiscatory in violation of the Fourteenth Amendment to the Constitution. It asked for a temporary injunction which was issued as prayed, and the court appointed a special master to hear testimony and make report to the court. The master filed his report, in which he found that the 40-cent rate was confiscatory; that the resolution of 1923 would remain in full force and effect unless it was also confiscatory, but that it was confiscatory. Both parties filed exceptions and the master then filed supplements to his report. When the case finally reached the court for decision, it held that both the 40-cent rate and the 45-cent rate were involved; that the former was confiscatory, which left the latter in effect; and that it was valid. It entered decree permanently enjoining the 40-cent rate, but dissolved the temporary injunction so far as it restrained the enforcement of the rate order of December 22, 1933, which was the 45-cent rate.

Plaintiff seeks reversal on six grounds, which may be stated as follows: (1) The court erred in holding that the invalidity of the 40-cent rate left in effect the 45-cent rate of December 22, 1933; (2) the court erred in underallowing depletion, depreciation, and expenses of the production property; (3) the court erred in its apportionment of production and transportation costs; (4) the court erred in striking from expenses the cost of leaked gas in excess of 10 per cent. of the gas purchased for the local plant and in disallowing the increased costs and expenses that would be necessary to attain and maintain the gas leak at only 10 per cent. of the gas purchased for the local plant; (5) the court erred in treating actual revenues as estimates, and in calculating revenues excessively; (6) the court erred in holding 6 per cent. as a fair rate of return.

1. Was the 45-cent rate properly a subject for adjudication in this case? The contention of plaintiff on this question is thus stated in its brief: "The District Court having declared the 40¢ rate invalid had no power or authority to revive or put into force and effect the previous 45¢ rate. The limit of the court's inquiry was as to the validity of the existing 40¢ rate and such rate having been declared invalid by the court, its jurisdiction ended. The court's function is judicial and not legislative in character and when the court by its decree fixed what it conceived to be a proper rate, to-wit: the 45¢ rate, it thereby exceeded its authority and usurped a legislative right and power."

It also urged that the rate prescribed by the order of December 22, 1933, was temporary and that it expired when the order of February 13, 1934, became effective.

It is true that the function of courts in the matter of rates is judicial and not legislative, but when rate-making bodies, in the exercise of power delegated to them by statutes, prescribe rates for a public utility, the courts have the power to examine them for the purpose of determining whether the prescribed rates are confiscatory. In performing this function they do not prescribe rates nor enact legislation. Central Kentucky Natural Gas Co. v. R. R. Commission, 290 U.S. 264, 54 S.Ct. 154, 78 L.Ed. 307; O'Donoghue v. United States, 289 U.S. 516, 53 S.Ct. 740, 77 L.Ed. 1356; Bluefield Water Works & Improvement Co. v. Public Service Commission, 262 U.S. 679, 43 S. Ct. 675, 67 L.Ed. 1176; Minnesota Rate Cases, Simpson v. Shepard, 230 U.S. 352, 33 S.Ct. 729, 57 L.Ed. 1511, 48 L.R.A.,N.S., 1151, Ann.Cas.1916A, 18; Newton v. Consolidated Gas Co., 258 U.S. 165, 42 S.Ct. 264, 66 L.Ed. 538. If, therefore, the order

or resolution prescribing the 45-cent rate was not repealed by the adoption and entry of the order prescribing the 40-cent rate, which the court held to be confiscatory, then on proper pleadings the court had authority to consider the question of the confiscatory character of that rate.

The resolution of December 22, 1933, embodied the 45-cent rate as previously adopted and provided for continuing the hearing on the question of reducing the rate then being charged. This same rate had been adopted in 1923, and but for the resolution of December 22, 1933, this would have remained in effect until changed. It cannot therefore be said that so far as fixing the 45-cent rate is concerned, the legislation was temporary. A void legislative enactment does not operate to repeal a preexisting valid one. Frost v. Corporation Commission, 278 U.S. 515, 49 S.Ct. 235, 73 L.Ed. 483; American Wood Products Co. v. City of Minneapolis, 8 Cir., 35 F.2d 657; Cogger v. Hazen, 66 App.D.C. 196, 85 F.2d 695; Conlon v. Adamski, 64 App.D.C. 274, 77 F.2d 397; Coffeyville Gas & Fuel Co. v. Public Utilities Commission, 116 Kan. 165, 225 P. 1036. It would seem too clear for argument that a law cannot be changed nor repealed by a subsequent act which is void. In City of Texarkana v. Southern Cities Distributing Co., 8 Cir., 64 F.2d 944, 945, it appeared that the rates fixed by the City Council had been nullified by popular referendum. In an opinion by Judge Stone, this court said: "The old rates automatically continued and they constituted the only lawful rates." Of course, the fact that the 45-cent rate legislation survived would not of necessity authorize the court to determine the question of its alleged confiscatory character. To warrant the court in so doing, that issue must have been presented by appropriate pleadings.

In paragraph 3 of the bill of complaint it is alleged that plaintiff is seeking to enjoin enforcement of the orders of December 22, 1933, and February 13, 1934. Paragraph 8 of the bill alleges: "That the said rates of April 10th, 1923 were grossly inadequate to return to plaintiff operating expenses or a reasonable return upon the property used and useful in the public service for the City of Texarkana, Arkansas."

The adoption of the resolution of December 22, 1933, and the steps leading up to it are alleged in paragraph 9, and in paragraph 10 it is alleged: "That the rates so established by the said City Council of the City of Texarkana, Arkansas, are unlawful, unreasonable, arbitrary and confiscatory and the enforcement of such rates has caused and will continue to cause daily confiscation of plaintiff's property; that the effect of the aforesaid resolutions and orders of the City Council of Texarkana, Arkansas, in denying plaintiff the right to earn a reasonable and adequate return upon the fair value of its property used and useful in rendering public utility gas service to the City of Texarkana, Arkansas, is to deprive plaintiff of its property without due process of law, deny it the equal protection of the laws, impair the obligations of its contracts and usurp its business management * * *."

In paragraph 21 of the bill it is, among other things, alleged that plaintiff has no adequate remedy at law, and that it will suffer irreparable injury if the defendants "are not enjoined from enforcing the orders of the City Council of Texarkana, Arkansas, dated December 22, 1933, and February 13, 1934, and from enforcing the 1923 rates reaffirmed with some modifications on December 22, 1933, and further modifications on February 13, 1934 * * *."

The prayer for relief asks for a temporary and permanent injunction against the enforcement of the orders of the City Council dated December 22, 1933, and February 13, 1934, and from enforcing the rates set out in the orders, or any rates less than those applied for.

Plaintiff having tendered the issue as to the reasonableness both of the 40-cent rate and the 45-cent rate, it was not error for the court to respond to the issue so tendered by plaintiff. If it could be said that the court erred in assuming to act, the plaintiff could not be heard to urge such error because it invited the very action which the court took. Gravelle Const. Co. v. Board of Commissioners, 8 Cir., 82 F.2d 391; Pitcairn v. Fisher, 8 Cir., 78 F.2d 649. We conclude that the actions of the City Council prescribing the 45-cent rate were not repealed by its subsequent void actions fixing a 40-cent rate, and that the decree of the court was within the issues presented by the pleadings.

2. It is next contended that the court erred in underallowing depletion, depreciation, and expenses of the production property. In presenting the contention that the rates assailed were confiscatory, the parties

sought to make proof of the cost of the service to the ultimate consumer. This was sought to be established, first, by proof of the cost at the town border, and, second, by proof of the cost of distributing that gas to consumers in the city. As an element of the cost at the city gate it was necessary to establish the value of plaintiff's properties devoted to the producing and delivering of the gas, and the fair return thereon, plus expenses of operation, the reasonable annual depletion, depreciation, and expenses of production. Similar facts were involved in determining the cost of delivery to customers within the city. As has been observed, plaintiff owns leases and wells in gas fields in Texas, Louisiana, and Arkansas, and in addition to gas from its own properties, it purchases from other producers. The gas is transported from producing wells through conduit pipe lines for delivery to city distributing systems. In addition to this, certain large industrial concerns are served directly from the transmission lines outside of the cities, while still others are served from the city distributing system within the cities. It also sells its product to other owners of distributing systems. The testimony covered a period of four years—1930 to 1933, both inclusive. The court held that annual depletion, depreciation, and amortization of the cost of developing leases, abandoned leases, producing leases, drilling dry holes, and geological and scouting activities, were properly chargeable to operating expenses and should be spread over the life of the gas reserves. Plaintiff challenges the correctness of the court's calculations in fixing the cost of the gas at the city gate. In determining this cost the court allowed for "depletion, depreciation and annual charge for amortization of the cost of gas reserves" the sum of $349,512.58. Plaintiff contended in the lower court, and renews the contention here, that these items should have been allowed in the sum of $543,701.-50. The court's finding is based upon the plaintiff's books, which showed an annual average amount for the four-year period, 1930 to 1933, inclusive, as follows:

1. Gas Production Depreciable Property.. $302,656.53
2. Geological Expenses ................... 12,691.56
3. Scouting Expenses .................... 13,059.85
4. Land and Leasehold Dept. Expense.... 21,104.64

   Total ............................ $349,512.58

In assailing this conclusion, plaintiff cites the testimony of numerous witnesses. To reproduce the testimony claimed by the plaintiff to support its contention in this regard, and the testimony claimed by the defendant to discredit plaintiff's contention, and the arguments of counsel pro and con, would seem to serve no useful purpose and would unduly extend this opinion. The evidence relied upon by plaintiff was not of such a character as to be controlling upon the court, and it cannot be said that the court's finding is not sustained by substantial evidence. The lower court in its opinion said: "While the amount charged upon the books of the plaintiff might be either too large or too small, yet it should, and does, represent the honest judgment of its experts, based upon their experience, of what is necessary to recoup this class of expenses. It is inconceivable that a utility, such as plaintiff, would knowingly make such a charge too small to amply cover such items of expense."

The claim that the court's finding is based upon erroneous data is not sustained by the record. The court was at liberty to accept the views of appellees' witnesses and to reject those of plaintiff's witnesses, especially their inferences or interpretations to be placed upon entries in plaintiff's books. The court need not concern itself with the methods or mathematics of accountants, save as they may throw light upon the ultimate question of confiscation. Upon that issue, plaintiff had the burden of proof. The court need not determine whether a more equitable rate might be allowed by the proper tribunal so long as confiscation is not established. Lindheimer v. Illinois Bell Telephone Co., 292 U.S. 151, 54 S.Ct. 658, 665, 78 L.Ed. 1182. Plaintiff had the burden "of making a convincing showing that the amounts it has charged to operating expenses for depreciation have not been excessive," and actual experience "is more convincing than tabulations of estimates," while "elaborate calculations which are at war with realities are of no avail." Lindheimer v. Illinois Bell Telephone Co., supra. In Dayton Power & Light Co. v. Pub. Util. Commission, 292 U.S. 290, 54 S.Ct. 647, 657, 78 L.Ed. 1267, in an opinion by Mr. Justice Cardozo, it is said: "Men do not transact business without protest at confiscatory rates, at all events in the absence of extraordinary circumstances making submission to the loss expedient."

Plaintiff is not in position to complain that the court accepted the entries in its books as reflecting the best judgment of

its expert accountants. These book entries were competent evidence of the facts supposed to be represented by them. Great Northern Ry. Co. v. Commissioner, 8 Cir., 40 F.2d 372; Northern Pac. R. Co. v. Helvering, 8 Cir., 83 F.2d 508. It is not to be presumed that plaintiff did itself an injustice in the computation of these items and in entering them on its own records. There are no hard and fast formulæ which may be adopted with assurance of their absolute accuracy in these calculations because many elements involved are elusive and uncertain. Apparently the figures were those upon which a reasonable rate of return was to be calculated by plaintiff, and it cannot seriously complain that its computations, set up in its books in the usual course of business, were accepted instead of those of ingenious experts prepared with a view of sustaining plaintiff's claim of confiscation.

3. Did the court err in its treatment of the Dixie Gulf contract? In 1928, plaintiff, faced with a serious shortage in the supply of gas for consumers, entered into a contract with the Dixie Gulf Gas Company. Both parties owned producing gas wells and were engaged in the business of selling and distributing natural gas. The contract provided that plaintiff should sell and deliver to Dixie Gulf Company a minimum of 35,000 m.c.f., or a maximum of 52,500 m.c. f., at Waskom, Texas, and that plaintiff should purchase daily from Dixie Gulf Company at the Monroe and Richland gas fields an amount of gas equal to the deliveries at Waskom. The sale price was to be 3½ cents per thousand more than the purchase price on the first 35,000 m.c.f., and 3 cents on the excess, with ¾ cents compression charges added. This contract enabled plaintiff to build a twenty-inch pipe line from the Monroe field to Waskom, a distance of 135 miles. Sixty per cent. of the capacity of this line is required to fill the maximum daily requirements of the Dixie Gulf contract, and the remainder of the capacity is available for supplying the inadequacy which plaintiff was experiencing in its various distributing centers. In connection with this pipe line there was constructed a compression station. In terms the contract provided that plaintiff should receive the agreed sum for use of the pipe line for transporting the gas from the field to Waskom, Texas. The pipe line served a dual purpose—that of transporting gas under the Dixie Gulf contract, and that of furnishing gas to other customers of plaintiff.

The lower court, in apportioning cost between the contract and the city, held that the gas transported under the contract should be included in the general-system commodity cost, and that transportation cost should be apportioned to the Dixie contract. The commodity demand method classifies costs as follows: (1) The cost of producing and purchasing the gas in the fields, called "commodity cost"; and (2) the cost of transporting the gas to the various delivery points, called the "demand cost." The commodity cost is allocated on the basis of the total general-system gas handled annually, viz., the total production and purchase cost of gas for the general system is divided by the general-system gas delivered. This gives the cost of gas per m.c.f., or the commodity cost. The commodity cost to any general-system customer of any given amount of gas is the product of the cost unit per m.c.f., and the volume of gas delivered. The evidence shows that there is included in the commodity cost the cost of operating and maintaining the production property, including severance taxes, royalties, and other taxes; the amortized cost of drilling dry holes; the amortized cost of abandoned leases; the geological, scouting, and land and leasehold expenses; the return on the production property; all income taxes on the return; the cost of gas purchased for the system; and an apportionment of the return on working capital and on going value.

The costs of transporting gas from the points of purchase and production to the point of delivery are called "demand costs," for the reason that such costs are properly apportioned on the basis of the peak annual twenty-four hour delivery of gas in each year. In this proceeding the peak demand of all the general-system delivery stations was ascertained and transportation costs were apportioned in the ratio that the demand of each delivery station bore to the total demand of all. The demand costs include the operation and maintenance and general expense of the transmission pipe lines and compressor stations, depreciation on same, taxes, the return on the value of the transmission system, together with the federal and state income taxes on such return, and the return on such part of working capital and going value as is properly apportioned to the value of the transmission property.

This, in general, was the method adopted by the court. Plaintiff insists that none of its production property is used to fulfill the Dixie Gulf contract, and that none of the costs of production should be charged against the contract, but that it should be charged with only 60 per cent. of the expense of the cost of transporting the gas through the pipe line.

■ A municipality may be treated as a unit for determining the rates to be charged to its inhabitants if arbitrary formulæ are not employed in allocating values or costs. Columbus Gas & Fuel Co. v. Public Utilities Commission, 292 U.S. 398, 54 S.Ct. 763, 78 L.Ed. 1327, 91 A.L.R. 1403. It is not confiscation to value the local property and then add to it the value of all property which is used and useful for supplying service to the city. Wabash Valley Electric Co. v. Young, 287 U.S. 488, 53 S.Ct. 234, 77 L.Ed. 447. Circumstances may make it unreasonable to consider milage as one of the elements entering into a computation of value for localized rates. Columbux Gas & Fuel Co. v. Public Utilities Commission, supra. It is to be observed that the question is one of confiscation, and not whether a more equitable distribution of costs or value might be made. Railroad Commission of California v. Pacific G. & E. Co., 58 S.Ct. 334, 82 L.Ed. ——, opinion filed Jan. 3, 1938.

■ Plaintiff insists that in the computation of the commodity cost of gas produced and purchased for general system requirements, the amount involved in the Dixie Gulf contract for purchase should be deducted from the total cost of gas purchased. This contention of plaintiff must be sustained. As the master found, the "purchase" and "sale" of the gas transported under this contract "wash out," and the liability of the Dixie Gulf Company is to pay a charge for the service of transportation. The performance of this contract is not a production of gas by plaintiff, nor in any sense a purchase. The annual volume of gas received for delivery under the Dixie Gulf contract for transportation was over 13,000,000 m.c.f. It is apparent that treating this fictitious purchase as real would give an undue proportion to the quantity of gas purported to have been purchased and sold for distribution, as the net amount sold to general system customers, outside of the 13,000,000 m.c.f. handled under the Dixie Gulf contract, was less than 26,000,000 m.c.f.

■ The inapplicability of the commodity cost to the arrangement which plaintiff had on the Dixie Gulf contract for the transportation of gas is very striking. There is in fact no producing property. None of the elements essential for determining the cost of production of gas enter into this particular transaction. The error, however, is not fatal to the rate established, unless confiscation results. The commodity cost, excluding the Dixie Gulf contract, is $.05644 per m.c.f. The commodity cost established by the court, including as it did, the Dixie Gulf contract, was $.05247 per m.c.f., or a difference of $.00397 per m.c.f. The annual town border delivery, including leakage allowed by the court, is 308,805 m.c.f., which results in an increased cost of gas sold in the city of $1,225.95. The court found that the total costs of operation, including an allowance of 6 per cent. on plaintiff's investment, were $140,882.07, and the plaintiff admits that the 45-cent rate will produce $141,560.32, resulting in a surplus of $678.25. The difference is $547.70, which we think is too small to establish confiscation.

■ The reasonableness or unreasonableness of a rate is not susceptible of determination with mathematical accuracy, nor is it measurable within a nice degree of exactness, but it is a question of fact and judgment calling for the exercise of sound discretion. As said by Chief Justice Hughes in United Gas Public Service Co. v. Texas, 58 S.Ct. 483, 493, 82 L.Ed. ——: "We have said that our inquiry in rate cases coming here from a state court 'is whether the action of the state officials in the totality of its consequences is consistent with the enjoyment by the regulated utility of a revenue something higher than the line of confiscation.'"

See, also, West Ohio Gas Co. v. Public Utilities Commission, 294 U.S. 63, 55 S.Ct. 316, 319, 79 L.Ed. 761.

There is a further question as to whether the demand cost as applied to the Dixie Gulf contract falls along with the commodity cost. This method assumes to a large extent a purchaser of gas whose demands, normal or abnormal, for gas for domestic, commercial, or industrial uses must be met by the producer who must maintain transmission and compressor facilities adequate to meet the greatest demand at any time. In this case, each delivery station represented a purchaser. So far as cost of transportation is involved here, it appears that there is a demand un-

der the Dixie Gulf contract which varies from day to day. The other party agrees to pay for a minimum amount each day, and also agrees that its maximum amount shall not exceed a certain amount. This is not true with relation to the ordinary industrial, commercial or domestic consumer, but within certain limits, as shown by actual experience, the consumer may reasonably predict the minimum and maximum requirements of the transportation part of the system. It therefore seems clear that the "demand cost" method of ascertaining the cost of transportation is fairly applicable to the requirements of the other party under this contract, whose demands for transportation may vary from day to day, and whose peak demands have been estimated by the contract of the parties. As said by the Supreme Court in Groesbeck v. Duluth, S. S. & A. R. Co., 250 U.S. 607, 40 S.Ct. 38, 41, 63 L.Ed. 1167: "The science of railroad accounting is in this respect in process of development; and it may be long before a formula is devised which can be accepted as satisfactory. For the present, at least, the question what formula the trial court should adopt presents a question, not of law, but of fact; and we are clearly unable to say that the lower court erred in adopting the method there pursued."

■ So far as transportation costs are concerned, we conclude that the court did not err in applying the "demand cost" method to the combined demands of the Dixie Gulf contract and other customers of the plaintiff, and apportioning costs and profits by this method.

■ 4. Plaintiff contends that the court erred (1) in striking from expenses the cost of leakage in excess of 10 per cent. of the gas purchased; (2) in not allowing as expenses the cost of repairs necessary to reduce the leakage to 10 per cent. and the annual cost of maintaining the leakage at that level. In common with all other human agencies, it is impossible to maintain a natural gas distribution system in perfect condition. There will always be some leakage. During the four-year period covered by the investigation in this case, the leakage on plaintiff's system was more than 29 per cent. of all gas sold and delivered. The City Council, the master, and the court all made an allowance for leakage of gas in the distribution system of 10 per cent. of all gas purchased for the Texarkana plant. This amount of leakage was found to be a reasonable allowance, and it is enough to say of this finding that it is sustained by abundant, substantial evidence. There was evidence that leakage in similar plants in other localities was less than 10 per cent. There was evidence that at a hearing before the City Council in 1929 plaintiff's predecessor submitted testimony that the normal rate of leakage ought to be about 5 per cent., and there was evidence of expert engineers sustaining the court's finding in this regard; in fact, there was testimony which would have sustained a very much lower percentage as reasonable leakage. The explanation for the excessive leakage in plaintiff's system was that when plaintiff acquired the plant in 1928, it was in bad repair and that the revenues derived from its operation since that time had not been sufficient to warrant remedying it. In other words, the plant was not being maintained in a reasonable state of efficiency. This was negligence for which the consumers of gas should not be required to pay. As said by the Supreme Court in West Ohio Gas Co. v. Public Utilities Commission, supra: "A public utility will not be permitted to include negligent or wasteful losses among its operating charges. The waste or negligence, however, must be established by evidence of one kind or another, either direct or circumstantial."

■ It remains to consider what, if any, allowance should be made plaintiff for bringing its plant up to that state of maintenance and repair necessary to reduce the loss to 10 per cent. of sales. First, it must be observed that if such allowance were made, there is no means of compelling the company to make the necessary repairs, and hence they may never be made. The master and the court expressed the view that such expenditures, if made, should be charged to the depreciation reserve account, and an allowance of 2 per cent. for depreciation was made. At any rate, the consumers should not be required to pay for mistakes or negligence in management. West Ohio Gas Co. v. Public Utilities Commission, supra; Landon v. Court of Industrial Relations, D.C., 269 F. 433. Plaintiff should itself place its system in proper condition. If and when it has done so it should be allowed, it would seem, to include as operating expenses the amount reasonably necessary to maintain the pipes and mains at the required standard of efficiency. It appears that a large part of the pipe in the distribution system is cast iron, and that

its life has been variously estimated at from seventy-five to one hundred years.

The amount of the depreciable property was fixed by the court at $292,973. A depreciation allowance of 2 per cent. on this sum will produce $5,859.46 annually. If, therefore, plaintiff should determine to reduce the leakage to some reasonable amount and to spread the cost over a reasonable number of years, this sum will probably cover the expense. But if the cost of repair and maintenance, if incurred by plaintiff, exceeds the allowance made by the court, it does not follow that confiscation will result.

5. Complaint is made that the court erred in determining the gross revenue resulting from an application of the 45-cent rate. Tables introduced by plaintiff covering its operations from 1930 to 1933, inclusive, showed average gross earnings from the 45-cent rate of $141,560.32. The court, by multiplying average annual sales by 45 cents arrived at a total revenue of $146,397.78 per annum. The court pointed out that there was no satisfactory basis and record for determining with accuracy the amount of revenue the 45-cent rate will produce. In disregarding the actual experience of plaintiff under the 45-cent rate, the court was in error, but the difference is so small as to be negligible.

6. The court allowed a return of 6 per cent. on the properties, which was the same rate allowed by the city council. Plaintiff contended for a rate of return of 10 per cent. on production property and 8 per cent. on both transportation and distribution properties. In its consideration of this question, the lower court, among other things, said: "When the price levels of '29 and '30, the time this Company did most of its construction work, are compared with the price levels of today, a 6 percent rate would be a substantial increase based on the price levels of today over those of '29 and '30. There has been within the last few years a decided decrease in the rate of interest in this section of the country. State securities and municipal securities in Arkansas have been refunded on a reduced interest rate. Securities of individuals and corporate entities have likewise undergone a reduction in interest rates. Taking into consideration these economic conditions, and the present corporate earnings in this and other industries, I am forced to conclude that the City Council did not act arbitrarily and fix the rate of return so unreasonably low as to contribute to a confiscatory rate."

The facts and conditions referred to by the court are supported by evidence in the record. The question was considered by the Supreme Court in Los Angeles Gas & Electric Corporation v. Railroad Commission, 289 U.S. 287, 53 S.Ct. 637, 649, 77 L. Ed. 1180, where, in an opinion by Chief Justice Hughes, it is, among other things, said: "We said in Bluefield Water Works Co. v. Public Service Commission, supra, 262 U.S. 679, pp. 692, 693, 43 S.Ct. 675, 67 L.Ed. 1176, that a 'public utility is entitled to such rates as will permit it to earn a return on the value of the property which it employs for the convenience of the public equal to that generally being made at the same time and in the same general part of the country on investments in other business undertakings which are attended by corresponding risks and uncertainties; but it has no constitutional right to profits such as are realized or anticipated in highly profitable enterprises or speculative ventures.' We added that the return 'should be reasonably sufficient to assure confidence in the financial soundness of the utility and should be adequate, under efficient and economical management, to maintain and support its credit and enable it to raise the money necessary for the proper discharge of its public duties.' And we recognized that 'a rate of return may be reasonable at one time and become too high or too low by changes affecting opportunities for investment, the money market and business conditions generally.' See Smith v. Illinois Bell Telephone Co., 282 U.S. 133, 160, 161, 51 S.Ct. 65, 73, 75 L.Ed. 255."

In face of existing financial conditions, it cannot be said that a return of 6 per cent. is so low as to be confiscatory. Ohio Associated Telephone Co. v. Geiger, D.C., 3 F.Supp. 997; Los Angeles Gas, etc., Co. v. Railroad Commission, supra; United Rys. & Electric Co. v. West, 280 U.S. 234, 50 S.Ct. 123, 74 L.Ed. 390; Willcox v. Consolidated Gas Co., 212 U.S. 19, 29 S.Ct. 192, 53 L.Ed. 382, 48 L.R.A.,N.S., 1134, 15 Ann.Cas. 1034. The question of what constitutes a reasonable return on invested capital is a relative one which is subject to fluctuation with the change of conditions affecting the money market and business conditions.

7. Defendants have presented several contentions, some of which are not disposed of by consideration of plaintiff's assign-

ments of error. Among these contentions it is urged that plaintiff did not exhaust its administrative remedy, and it so contended in the lower court, but the court denied its contention and defendants have not filed a cross-appeal. We do not think the contention well taken, but in view of our conclusion on the other issues it would seem to be quite unnecessary to pass upon these affirmative contentions of the defendants.

Finding no substantial error in the decree appealed from, it is affirmed.